**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Daniel HAMANN, Defendant-Appellant.**

No. 81–2950.

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1982.

Decided Sept. 13, 1982.

Mel S. Johnson, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Robert J. Lerner, Milwaukee, Wis., for defendant-appellant.

Before PELL, Circuit Judge, GIBSON,* Senior Circuit Judge, and ESCHBACH, Circuit Judge.

PELL, Circuit Judge.

The defendant-appellant Daniel Hamann was convicted following a jury trial of one count of mail fraud in violation of 18 U.S.C. § 1341 (1976). The fraud charged was that the defendant devised and carried out a scheme to defraud mail order companies by ordering merchandise through the mail, using his own name and address, but fraudulent credit card numbers with no intention to pay for the merchandise. Hamann was charged with nine counts, but convicted on only one. He appeals from the conviction on two grounds: (1) that the trial court erred in giving the deadlocked jury supplemental instructions which violated this court's rule as enunciated in *United States v. Silvern*, 484 F.2d 879 (7th Cir. 1973) (en banc); and (2) that the trial court abused its discretion by admitting handwriting exemplars which revealed that Hamann was

---

* Floyd R. Gibson, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

incarcerated at the time of the alleged crimes. Before turning to consider those questions, we briefly summarize the evidence on the issue of guilt or innocence, and those events at trial pertinent to the above assignments of error.

### I.

In statements made to various law enforcement officials, the defendant admitted to perpetrating a scheme in which he sent mail orders to companies nationwide, purporting to pay for the merchandise with a variety of credit card numbers he was not authorized to use. He had learned the credit card number codes from magazine ads and catalogues which pictured credit cards. He had done all this from his residences at Fox Lake and Waupun, Wisconsin,[1] from about August, 1979 to about August, 1980. He received a number of items he intended to keep.

The evidence relating specifically to the count on which the defendant was convicted also included the testimony of a customer service supervisor from one of the companies from which Hamann had ordered merchandise. She identified an exhibit as a mail order form her company had received from Hamann, for $344.94 worth of merchandise, to be paid for with an American Express credit card number. She then testified that she had checked on the validity of that number, and sent Hamann a letter at a Fox Lake, Wisconsin address informing him that the number was incorrect and asking for a correct number. The defendant had already stipulated that Hamann was at that address at the relevant date. She identified another exhibit as a reply to her letter, written on the letter she had sent, apologizing for the "mix-up" and substituting a new MasterCard number to pay for the merchandise. The reply was signed "Daniel Hamann."

The Government also presented the testimony of a document analyst, who testified that the handwriting on the order and the

note giving a new MasterCard number were written by the same person, and that the writing was the same as that on the samples provided to him, written by the defendant.

The defendant objected to the admission of the samples of his handwriting because they included letters from his prison file, and their authentication would reveal that he was in prison at the time the crimes were allegedly committed and during the trial. He argued that the prejudicial impact of the prison address would outweigh the letters' probative value. The trial court ruled the letters were admissible, but cautioned the jury that the fact of Hamann's incarceration was not relevant to prove his guilt in this case.

At the close of the case, the court instructed the jury. Among the instructions was an instruction on disagreement among jurors. The instruction was that formulated by the Committee on Federal Criminal Jury Instructions of the Seventh Circuit, Fed.Crim. Jury Instructions § 7.06 (Approved in principle 1980). That instruction modified the instruction mandated by this court in the exercise of its supervisory powers in *United States v. Silvern*, 484 F.2d 879 (7th Cir. 1973) (en banc). No objection was made to the instruction.

The jury deliberated for the afternoon and early evening, and then again the next morning. The jury sent a note as follows:

> Judge Warren: We appear to be a "hung jury." We also understand that there is a given length of time a jury is to deliberate before they may be considered "hung."
>
> In our deliberations the phrase "til hell freezes over" has been used, and we believe it now. What the term "intent" means seems to be the problem.

The judge solicited suggestions from both parties on how to respond to the jury note, and called the jury back in. He informed them, in the presence of counsel, that there

---

1. It was stipulated by the parties that the fact that the residences were Wisconsin prisons would not be mentioned.

was no given length of time that they were to deliberate before they were considered "hung," and reread the disagreement instruction to them, as per the procedure outlined in *Silvern* and the Jury Instructions § 7.06, Committee Comment at 110. He then went on to make the following comments:

Now, the phrase that you used in your note "till hell freezes over" does imply to the Court at least a certain inflexibility of mind. I don't know where you stand, I don't know how many of you are standing on a position that is represented by the term or by the term "till hell freezes over," but I would urge you to consider the words that I have just read to you and again remind you that you are part of the system of justice and that the failure to arrive at a determination does represent an inability to make the system work.

That would be unfortunate. I am not prepared at this time to declare a mistrial. I would inquire at this time, the last sentence of your note says the term "intent" seems to be the problem.

Now, you have a copy of the Court's instructions in the juryroom and the facts in this case are not complicated. Some of the trials that we have in this court involve very complicated factual situations, and it takes a lot of intricate thinking to unravel them.

But this case is rather straightforward. Both sides have acknowledged that . . . .

The judge then asked the jury if there was anything further he could clarify. A juror responded that it was hard for the jurors to ask questions without revealing where they stood, and the judge suggested they return to the jury room and write another note pinpointing what further instruction was necessary.

The jury returned to the jury room to formulate their questions, and while they did so, the defendant moved for a mistrial on the basis that the court's statement following the rereading of the disagreement instructions was incorrect and prejudicial. The motion was denied. The jury then sent out two notes, the first of which related to the meaning of "intent to defraud." The second note read:

Would you want any of us to change our minds if they didn't agree with the other or others just to end this trial? We agree on one charge only. Can this be? Does it have to be on all nine charges?

In response to the notes, the court reread the instruction on intent to defraud, and that portion of the instructions relating to the separability of the counts. The court indicated that his previous rereading of the instruction on disagreement should answer the second question, and control how the jury deliberated as a corporate body. The following colloquy then occurred:

JUROR: Are you saying, then, if we agree on one charge, we can give the verdict on that? What about the other ones, then?

THE COURT: What I am saying is that you consider one count, one charge, and if you can arrive at a verdict on one count, but you are unable to arrive at a verdict on the others, yes, you should come in and report that to the Court.

JUROR: Because I think at this point, then, that's what we would want to do. I don't know.

The jury then retired for further deliberations, and the defendant again moved for a mistrial, which was denied. The jury then returned with a verdict of guilty on count six of the indictment, and no verdict on the other eight counts.

## II.

The defendant's first contention is that the supplemental instructions to the deadlocked jury violated the mandate of this court in *United States v. Silvern*, 484 F.2d 879 (7th Cir. 1973) (en banc), and coerced a verdict. He urges that first the trial court erred by rereading the *Silvern* instruction, because the jury had already been furnished with a written copy of the instruction; second, that the court's "embellishment" of the instruction was coercive and unnecessary; and third that the court erred in responding to the jury's second question on juror disagreement.

■ As to the first contention, that the court erred in rereading the instruction when written instructions had already been provided, we find no merit in this contention. The decision whether to reread an instruction is within the discretion of the court. *United States v. Medansky*, 486 F.2d 807, 813 n.6 (7th Cir. 1973), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1587, 39 L.Ed.2d 886 (1974), and may be repeated orally even when the jury already has a written copy of the charge. *United States v. Gabriel*, 597 F.2d 95, 100 (7th Cir. 1979), *cert. denied*, 444 U.S. 858, 100 S.Ct. 120, 62 L.Ed.2d 78. *See* Fed.Crim.Jury Instructions § 7.06 (Committee Comment at 110). Such rereading is consistent with *Silvern* and the recommendations of the Jury Instructions Committee. We do not find it coercive of a verdict in any respect.

■ Nor are we persuaded that the additional remarks by the court violated the *Silvern* rule or were coercive in the context of the instructions as a whole. The defendant takes particular issue with two of the court's statements; first that the jurors were "part of the system of justice and that the failure to arrive at a determination does represent an inability to make the system work," and second, that "this case is rather straightforward."

In *United States v. Silvern*, this court established particular procedures for the giving of a supplemental instruction in the event of juror deadlock. The court required the use of a particular instruction, and required that the instruction should have been given prior to the time the jury retired for it to be repeated on deadlock. 484 F.2d at 882-83. The *Silvern* court noted that its language was not "graven in stone," *id.* at n.7, but nonetheless held, "[i]f in any jury trial ... a supplemental instruction relating to a deadlock is given other than in the [mandated] form, a resulting conviction will be reversed and remanded for a new trial." 484 F.2d at 883. The Jury Instructions Committee rearranged the structure and modified the wording of the *Silvern* instruction, but retained the requirement that only the form instruction

be given, and that the instruction be given before the jury retired.

In determining whether the trial court's comments following the giving of the approved instruction violate the *Silvern* rule, it is well to keep in mind our oft-repeated axiom that all the instructions be considered as a whole when determining the propriety of any given instruction. *See, e.g., United States v. Johnson*, 605 F.2d 1025, 1027 (7th Cir. 1979) (en banc), *cert. denied*, 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980); *United States v. Patrick*, 542 F.2d 381, 389 (7th Cir. 1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977); *United States v. Brown*, 518 F.2d 821, 826 (7th Cir. 1975), *cert. denied*, 423 U.S. 917, 96 S.Ct. 225, 46 L.Ed.2d 146. We are not persuaded that the court's remarks, when viewed in the context of the entire instructions, constitute a violation of the *Silvern* rule.

In this regard, we note first that the challenged remarks followed on the heels of a reiteration of the Committee-approved instructions, and that the jurors had a copy of that instruction in the jury room with them. Nor do we find the remarks so prejudicial that they taint the otherwise appropriate and unchallenged portion of the instructions. In *United States v. Peskin*, 527 F.2d 71, 84–85 (7th Cir. 1975), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976), and *United States ex rel. Anthony v. Sielaff*, 552 F.2d 588, 591 (7th Cir. 1977), this court examined situations where the trial court had engaged in conduct the defendants claimed violated the *Silvern* procedures. In both decisions the emphasis of this court's analysis was whether the court's communications pressured the jury to surrender their honest opinions for the mere purpose of returning a verdict.

The statement that the failure of the jury to reach a verdict represents a failure of the system is merely a truism which is not the equivalent of telling the jurors to surrender their honest opinions. Furthermore, even if one could so interpret this language on its face, the context of the court's remarks makes it clear that no coercive effect

was intended or likely to result. The comment is also neutral—that is, it favors neither the defense nor the prosecution, and in no way indicates that expediency is to be preferred at the expense of juror conviction.

Even were we to find the comment a technical violation of the *Silvern* rule, however, it would be harmless in these circumstances. We note first that the evidence of guilt can fairly be characterized as overwhelming. This certainly supports a finding of no prejudice. *United States v. Martin*, 475 F.2d 943, 948 (D.C.Cir.1973). Technical rules of trial procedure have been developed over the years as experience has shown that conformance to them will tend to produce a fair trial free of improper influences. That these rules are salutary in their purpose should not preclude a reviewing court from looking at their application and determining that claimed deviations are inconsequential, if not nonexistent, in producing an unfairness to the litigants and their right to a fair trial. Further, we think we can safely assume that while jurors may not be versed in the intricacies of the law they will not leave behind them their own common sense in evaluating remarks such as those made here.

Here the jury's second note makes it clear that the jurors had already reached accord on one count when they sent out the first note. Since they brought in a verdict only on one count, the inference is compelling that the court's additional comments had no impact on the jury's subsequent decision.

Turning to the court's remark that the case was a straightforward one, we similarly find no prejudice or coercive effect. In context it is clear that the court was referring to the facts before the jury—not their legal significance or the outcome of the case. Indeed, as the court pointed out, both sides had, in fact, characterized the case as a simple one in their closing statements. The remark was again, neutral, and did not urge the jurors to give up their convictions to reach a verdict. The remark did not, therefore, taint the court's otherwise proper adherence to the *Silvern* procedures.

■ The defendant's third contention relating to the jury instructions is that the court failed adequately to respond to the jury's question, "Would you want any of us to change our mind if they didn't agree with the . . . others just to end this trial?" The defendant contends a simple no was the required answer, and that allusion to the juror disagreement instruction was insufficient. We disagree. The instruction, which had been read twice and provided to the jury in written form, makes it absolutely clear that the answer is no. The court was aware of the strictures of the *Silvern* rule and was doing its best to adhere. While a simple no might have sufficed, the court's response was equally appropriate.

We conclude, therefore, that the court's additional remarks did not violate the *Silvern* rule, and turn to the defendant's contention that it was an abuse of the trial court's discretion to have admitted evidence which revealed that the defendant was incarcerated in state prison at the time the crimes were allegedly committed.

### III.

■ Admission of the documents revealing the defendant's incarceration is governed by Rule 403 of the Federal Rules of Evidence. The rule provides that relevant evidence may be excluded if the danger of unfair prejudice substantially outweighs the probative value of the evidence. The balancing of these two factors is committed to the discretion of the trial court. This court has repeatedly held that such discretion is broad in this context, and that substantial deference is to be accorded the ruling of the trial court. *United States v. Dolliole*, 597 F.2d 102, 107 (7th Cir. 1979), *cert. denied*, 442 U.S. 946, 99 S.Ct. 2894, 61 L.Ed.2d 318; *United States v. Juarez*, 561 F.2d 65, 71 (7th Cir. 1977); *United States v. Harris*, 542 F.2d 1283, 1317 (7th Cir. 1976), *cert. denied*, 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1976).

The probative value of the letters was high. The Government's handwriting expert testified that he was originally provid-

ed only three known specimens of the defendant's handwriting with which to identify the handwriting on fifteen to eighteen documents. On that basis he could arrive at only a qualified conclusion that Hamann had probably written the signatures on the questioned documents. Provision of the additional letters from Hamann's prison file enabled the expert to reach a definite conclusion and identify the defendant as the author of the questioned documents.

The defendant assails the probative worth of the documents on the grounds of their questionable authenticity, and that the Government could have obtained court-ordered exemplars which did not reveal his prison address. As to authenticity, we note that there was evidence establishing that the letters were from Hamann's file, and that there was only one Daniel Hamann in the Wisconsin prison system. The defendant points to testimony that sometimes prisoners wrote letters on behalf of others, and that no witnesses saw Hamann write the letters. The testimony referred to, however, establishes only that blind or illiterate prisoners had others write letters for them. Hamann was in neither category. The authenticity of the letters is well established.

While court-ordered exemplars could, of course, have been obtained, it was not required that the Government do so. The Government's expert testified that the fact that the exemplars were not court-ordered made them more reliable, and hence, more probative. As the trial court pointed out, that is only common sense. It certainly seems patent that a person's handwriting is much more likely to be his own natural, undisguised product when written on everyday routine occasions than it is when the writing is written pursuant to a court order with knowledge on the part of the scrivener that the examples furnished might be used in a prosecution against him.

Furthermore, the court sought to minimize whatever prejudice the letters might have generated by instructing the jury as to the limited purpose for which the evidence was introduced. *See United States v. Caldwell*, 625 F.2d 144 (7th Cir. 1980); *United States v. Robbins*, 613 F.2d 688, 695 (8th Cir. 1979); *Dolliole*, 597 F.2d at 102. That no prejudice in fact resulted is highly suggested by the outcome of the case. If there was substantial prejudice, it is difficult to understand why the defendant was convicted only on one of the nine counts. We conclude therefore that the trial court did not abuse its discretion by admitting the letters revealing Hamann's incarceration.

For all the foregoing reasons, the conviction appealed from is

AFFIRMED.