**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Rene RODRIGUEZ, Defendant–Appellant.**

No. 94–2080.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 4, 1995.

Decided Oct. 10, 1995.

Stephen J. Liccione, Asst. U.S. Atty. (argued), Milwaukee, WI, for Plaintiff–Appellee.

Hugh Davis, Kevin Ernst, Timothy M. Holloway (argued), Detroit, MI, for Defendant–Appellant.

Before BAUER and MANION, Circuit Judges, and MILLER, District Judge.*

MILLER, District Judge.

Rene Rodriguez appeals his conviction and life sentence for conspiracy to deliver marijuana. Mr. Rodriguez and his brothers, based in Texas, supplied large quantities of marijuana to Michael Cook, a Milwaukee distributor, through middlemen Mario Gonzalez and Jose Garcia. Because the issues do not require a full recitation of the facts, we set forth further facts as necessary. Finding no reversible error, we affirm.

### A. The Deliberating Jury

We discuss Mr. Rodriguez's first two contentions together. He contends that his rights under Fed.R.Crim.P. 43 and the due process clause of the Fifth Amendment were violated when the trial court answered the deliberating jury's questions and had testimony read back to the deliberating jury when Mr. Rodriguez was absent.

Jury deliberations began on a Friday afternoon. About two hours into its deliberations on Friday, the jury sent a note asking to hear two tape recordings or transcripts.[1] The court called counsel into the courtroom, but the record does not indicate that Mr. Rodriguez was present. The attorneys agreed that the court, after determining whether the jury wanted the tapes or the transcripts, could either provide the jury with the transcripts or allow those tapes to be played pursuant to a procedure specified by the court. Some time later, the jury was sent home for the night.

On Monday morning, the court received a request from the jury for three other transcripts. Without consulting counsel, the court directed the bailiff to deliver the requested transcripts to the jury.

On Tuesday morning, the jury sent the court another note asking, "Is it possible for the jury to see the transcript of the court proceedings to verify the testimony of the witnesses in court?" The court telephoned counsel and informed them of the jury's request. There is no indication on the record that Mr. Rodriguez was included in the call. Counsel agreed that the court should tell the jury that transcripts were unavailable, but that if the jury was interested in the testimony of a particular witness, that testimony could be read back; counsel agreed with the court that the witness's direct and cross examinations should be read.

It developed that the jury was interested in the testimony of government witness Mario Gonzalez. The jury listened to the court reporter read Gonzalez's testimony for slightly less than an hour before the court broke for lunch. Neither counsel nor Mr. Rodriguez attended this session. Before the reading resumed, the jury sent another note: "The jury agrees that it has heard an adequate amount of the testimony and does not require further reading." Again, the court contacted the attorneys by telephone and informed them of the note; again, the record

---

* The Honorable Robert L. Miller, Jr., of the United States District Court for the Northern District of Indiana, is sitting by designation.

1. The identified exhibits were transcripts, but the jury asked to hear them.

does not indicate Mr. Rodriguez's participation. The court informed counsel that the entire direct examination, and perhaps slightly more than a third of the cross examination, of Gonzalez's testimony had been read before the lunch break. The judge also informed counsel of his observations of the juror's attention during the reading of the testimony: the judge believed the jury's attention had begun to fade by the end of the direct examination, perked up as the cross began, then faded again. Both counsel agreed to allow the reading of the Gonzalez testimony to be terminated in light of the jury's note.

■ The trial court erred in its handling of the jury's requests. Discussions between court and counsel regarding jury inquiries must take place on the record in the defendant's presence. *United States v. Smith*, 31 F.3d 469, 471 (7th Cir.1994); *see also United States v. Patterson*, 23 F.3d 1239, 1254 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 527, 130 L.Ed.2d 431 (1994). In *Rogers v. United States*, 422 U.S. 35, 39, 95 S.Ct. 2091, 2094–95, 45 L.Ed.2d 1 (1975), the Supreme Court enunciated the procedures a district judge should follow when communicating with the jury during deliberations: the defense attorney should be given an opportunity to be heard before the district judge responds to the jury's inquiry, and the jury's inquiry should be answered in open court. The accused has the right under the Sixth Amendment to be present at all stages of his trial, including the jury deliberations and communications to the jury. Fed.R.Crim P. 43(a); *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985); *United States v. Billingsley*, 766 F.2d 1015, 1019 (7th Cir.1985); *cf. United States v. Moore*, 936 F.2d 1508, 1523 (7th Cir.), *cert. denied*, 502 U.S. 991, 112 S.Ct. 607, 116 L.Ed.2d 630 (1991); *United States v. Shukitis*, 877 F.2d 1322, 1329–1330 (7th Cir.1989).

■ Mr. Rodriguez should have been present during the discussions with counsel. The government argues that Mr. Rodriguez waived any objection based on Rule 43 by failing to object in the trial court. The transcript reflects no objection by Mr. Rodriguez's counsel based on the accused's ab-

sence, but our precedent holds that a violation of Rule 43(a) is subject to harmless error analysis even when no objection was made in the trial court. *United States v. Silverstein*, 732 F.2d 1338, 1348 (7th Cir.1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985). A defendant may waive his right to be present, *see United States v. Neff*, 10 F.3d 1321, 1324 (7th Cir.1993), but a purported waiver by counsel is not adequate to effect a waiver. *United States v. Billingsley*, 766 F.2d at 1020. The record suggests no waiver by Mr. Rodriguez, who was in custody during the deliberations. When an accused's right to be present was violated, the conviction must be reversed unless the record negates any reasonable possibility of prejudice arising from the error. *United States v. Smith*, 31 F.3d 469, 473–474 (7th Cir.1994).

■ In *United States v. Patterson*, 23 F.3d at 1255, we held that the failure to secure the defendant's presence is harmless if the issue is not one on which counsel would be likely to consult the defendant, or if it is not one for which the defendant, if consulted, would be likely to have an answer that would sway the judge. We cannot conceive of any input Mr. Rodriguez might have offered that would have swayed the judge with respect to the initial provision of the tapes or transcripts, or with respect to the decision to honor the jury's request to stop reading Gonzalez's testimony. Mr. Rodriguez's counsel agreed to both courses of action; Mr. Rodriguez offers no indication of what he might have said to propose a different course. The failure to procure Mr. Rodriguez's attendance to consult and respond to these jury inquiries, while violative of Rule 43, was harmless error.

■ The court's response to the Monday morning request for additional transcripts is more troubling. Pursuant to *Rogers*, the court should have consulted counsel and allowed an opportunity to object. But for the Friday colloquy about the first request, in which counsel agreed that the jury could be provided with transcripts, we would reverse for this error. The Friday colloquy, howev-

er, persuades us that this error, too, was harmless.

Mr. Rodriguez cites *Walberg v. Israel,* 766 F.2d 1071, 1076 (7th Cir.1985), for the proposition that prejudice is presumed from the court's failure to notify counsel of the jury's request, but we believe counsel reads *Walberg* too broadly. There is a marked difference between a trial judge depriving an accused of the full efforts of counsel by threatening the attorney's continued employment if the attorney zealously represented his client, as in *Walberg,* and a trial judge relying, though improvidently, on counsel's uncoerced response to a nearly identical request by the jury. Under the circumstances of this case, we do not believe that *Walberg* forecloses application of the harmless error standard.

The trial transcript reveals no different treatment of the conversations in the Friday and Monday requests. Although our review of the record does not disclose that the transcripts were admitted into evidence in addition to the tapes, we have found no dispute over the transcripts' accuracy, and the Friday colloquy demonstrates counsel's willingness to allow the jury to review transcripts rather than the tape recordings if the jury so desired. With nothing in the record to support an inference that Mr. Rodriguez and his counsel would have objected to providing the transcripts requested on Monday after counsel assented to providing other transcripts on Friday, the conclusion that the error was harmless is inescapable.

Thus, while we agree with Mr. Rodriguez that his rights under the Fifth and Sixth Amendments, as well as his right under Rule 43, were violated by the trial court's failures to allow him to be present when jury inquiries were discussed and answered, and by the trial court's failure to notify counsel before responding to the jury's Monday request for transcripts, these errors were harmless because the record negates any reasonable possibility of prejudice arising from the error.

### B. Jury Instructions

Mr. Rodriguez raises several issues loosely based on the instructions given the jury.

### 1. Drug Quantity as Element of Crime

■ Mr. Rodriguez contends that the district court erred in holding that the quantity of marijuana involved was not an element of a drug conspiracy offense under 21 U.S.C. § 846. He maintains that the issue of the quantity of marijuana should have been submitted to the jury as an essential element of the offense charged, and that the district court constructively amended the indictment by declining to submit the issue to the jury.

The trial court was correct. Any uncertainty engendered by our older decisions in *United States v. Levy,* 955 F.2d 1098, 1105–1106 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 102, 121 L.Ed.2d 62 (1992), *United States v. Teslim,* 869 F.2d 316, 325–326 (7th Cir.1989), *denial of post conviction relief aff'd,* 998 F.2d 1016 (7th Cir.1993), and *United States v. Liefer,* 778 F.2d 1236 (7th Cir.1985), is laid to rest by our more recent clear holdings that the quantity of drugs involved is not a substantive element of a drug offense. *United States v. Edwards,* 36 F.3d 639, 648 (7th Cir.1994); *United States v. Schuster,* 948 F.2d 313, 315 (7th Cir.1991); *United States v. Ebbole,* 917 F.2d 1495, 1501 (7th Cir.1991), *denial of post conviction relief aff'd,* 8 F.3d 530 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1229, 127 L.Ed.2d 573 (1994); *United States v. Reynolds,* 900 F.2d 1000, 1004 (7th Cir.1990); *United States v. Acevedo,* 891 F.2d 607, 611 (7th Cir.1989).

### 2. Overt Act and Venue

Mr. Rodriguez links an argument on jury instructions with an argument addressed to the indictment's sufficiency. He contends that the indictment's failure to allege an overt act—specifically, an overt act in the Eastern District of Wisconsin—provided him with inadequate notice of the venue element. He further argues that the district court's failure to instruct the jury that an overt act must be proven to have been committed in Wisconsin's Eastern District violated his rights to due process and jury trial. We cannot agree.

■ Mr. Rodriguez's contention with respect to venue is untimely. A defendant

may waive the right to insist that the government establish venue. *United States v. Mc-Donough,* 603 F.2d 19, 22 (7th Cir.1979). A defect not apparent on the face of the indictment may be raised in a motion for acquittal, *United States v. Brandon,* 50 F.3d 464, 469 (7th Cir.1995); *United States v. John,* 518 F.2d 705, 708–709 (7th Cir.1975), but Mr. Rodriguez's motion for acquittal did not raise the venue issue. Mr. Rodriguez did not request a jury instruction on venue or object to the failure to give one. *Cf. United States v. Sax,* 39 F.3d 1380, 1391 (7th Cir.1994).

Moreover, venue was proper. Distributor Cook travelled between Milwaukee and Houston in furtherance of drug transactions, and middlemen Gonzalez and Garcia caused the marijuana to be transported from Texas to Milwaukee. Venue under 21 U.S.C. § 846 lies in any district in which an overt act in furtherance of the conspiracy occurred. *United States v. Mayo,* 721 F.2d 1084, 1089–1090 (7th Cir.1983). Mr. Rodriguez has offered no construction of the evidence under which the jury might have found, beyond a reasonable doubt, that Mr. Rodriguez was guilty of conspiracy, without believing that conduct occurred in the Eastern District of Wisconsin.

Second, the district court did not err in refusing to instruct the jury that the government must prove an overt act to establish the conspiracy charge. At the time of Mr. Rodriguez's trial, this circuit had held that "in a prosecution under § 846 the indictment need not charge, the proof need not show, and the charge to the jury need not mention, an overt act in furtherance of the illegal objective." *United States v. Sassi,* 966 F.2d 283, 285 (7th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992). Since Mr. Rodriguez's trial, the United States Supreme Court unanimously adopted the same position. *United States v. Shabani,* — U.S. ——, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994).

### 3. The Supplemental Instruction

Mr. Rodriguez complains of the district court's supplemental instruction, given on the third day of deliberations, which Mr. Rodriguez describes as a forbidden "Allen" instruction. *See Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). After declining to listen to the remainder of Gonzalez's testimony, the jury sent a note to the court: "Honorable Judge Curran, the jury is unable to reach a unanimous verdict, in spite of intense discussions and all of the information provided by the court. How do we proceed?" The judge conducted a telephonic, on-the-record conversation with counsel to decide how to respond. The court offered to have more testimony read to the jury, or to repeat an instruction already given as part of the final instructions pursuant to *United States v. Silvern,* 484 F.2d 879 (7th Cir.1973). Mr. Rodriguez's counsel expressed a disinclination to have the instruction repeated, but after the judge indicated that he would first offer to have the balance of the Gonzalez testimony read, Mr. Rodriguez's counsel acceded without objection.

The court, counsel, defendant, and jury then reconvened in the courtroom, and the judge addressed the jury as follows:

I've asked counsel and the defendant to be present here because I want to first of all tell you that, as I know you already know, because of the lunch interruption you didn't hear all the testimony of Mr. Gonzalez, and if that would be of any help to you that could be read to you. But your note indicated that you did not need to hear any more of his testimony and I took you at your word in that regard.

If there are any specific questions that you have, the court is never too busy to respond to them, sometime it might take a little time to do it, but the court is never too busy to respond to it, and if there are some areas of concern that you have that you want to have the court furnish you with information on, that is appropriate, I'll be glad to try to do that for you. I know how hard you have worked and how diligently you've attempted to reach a verdict in this matter; I just hate to have it— have you go home without being able to reach a verdict.

And, of course, I don't want you to tell me how you stand numerically or otherwise on this issue. But you should, as I

told you before, make every reasonable effort to reach a verdict and in doing so consult with one another and listen, listen carefully to the positions of the others, and don't hesitate to change your mind if you come to believe that you have taken a wrong position on some of the evidence.

On the other hand, I don't want you to surrender your honest beliefs as to the weight or the effect of the evidence if you're convinced that you're right. But I think that it's important to remind yourselves of the key words of "listen" and "evaluate."

Remember I told you, you're the judges, you're the impartial judges. You're not an advocate here, you're an impartial judge of the evidence. And I would hope—and I'm going to ask you to return to the jury room and attempt in light of this to reach a verdict and see if you can't reach some unanimity of agreement. And in the meantime, as I said, I stand ready to respond to any questions that you might have touching upon the evidence. Or, if there is some other testimony that you feel you'd like to have read to you, we'll try to arrange that for you, too.

All right. Court will stand in recess.

After the jury left the courtroom, Mr. Rodriguez's counsel stated that while he did not object to the offer to read testimony, he objected "to the court further urging a jury, which I believe has shown that they've thought carefully about the issues, to deliberate further if they didn't want to hear the Gonzalez testimony." The judge overruled the objection, stating that if, after another hour's deliberations, the jury indicated a continuing inability to reach a verdict, he would discharge the jury. The guilty verdict was returned about an hour later.

Mr. Rodriguez now raises what we perceive as two objections to this supplemental instruction: giving it at all (the objection raised at trial), and the language employed (the objection raised here).

■ It is unclear what Mr. Rodriguez believes the trial judge should have done in response to the jury's note. He does not appear to contend that the judge should have immediately declared a mistrial, and such a course hardly would seem warranted. The jury simply had indicated that it had not reached a verdict and sought advice on how to proceed. We do not mean to suggest that a defendant must (or even may) demand that the jury use words such as "impasse" or "deadlock", but the language of the jury's note cannot be ignored. We cannot say that the trial judge, confronted with a jury asking advice, abused his discretion in deciding to give a supplemental instruction.

■ In giving a supplemental instruction that varied from the language approved in *Silvern*, however, the judge embarked upon a risky course. In *Silvern*, we recognized that not all supplemental instructions suffer from the same ills as the "dynamite" charge in *Allen*, and approved the use of the following instruction, if also given as part of the final instructions:

> The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

> You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.

484 F.2d at 883.

The *Silvern* court announced that any supplemental instruction relating to a jury deadlock other than in the approved form would result in reversal of any conviction, *id.*, but we have not required trial courts to replicate

the approved language with no deviation. A review of our post-*Silvern* cases indicates that when no objection was raised to the phrasing of the supplemental instruction, the proper inquiry is not whether the trial court recited the approved language with perfect accuracy, but rather whether the judge's departure from the approved language changed the balance struck by the approved language in such a way as to be more coercive of unanimity.

The challenge in *United States v. Peskin,* 527 F.2d 71, 84–85 (7th Cir.1975), *cert. denied,* 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976), was not to a supplemental instruction (the *Silvern* instruction had been given), but rather to the court's inquiry of the deliberating jury as to whether "it would be profitable and possible to reach a complete agreement on all counts of the indictment" if the jury were allowed to deliberate for another half hour, beyond which the court said it did not intend to keep the jury. Reviewing for plain error, we concluded that the judge's comments would not have persuaded a juror to surrender, for expediency's sake, an honest belief that the defendant's guilt had not been proven.

In *United States v. Hamann,* 688 F.2d 507 (7th Cir.1982), *cert. denied,* 460 U.S. 1013, 103 S.Ct. 1255, 75 L.Ed.2d 483 (1983), the defendant sought reversal because the trial court had "embellished" the instruction approved in *Silvern:* the trial court had commented that the jurors were "part of the system of justice and that the failure to arrive at a determination does represent an inability to make the system work," and described the case as "rather straightforward". 688 F.2d at 510. We found no reversible error; viewing the instructions as a whole, we found that the additional remarks were not so prejudicial as to taint the otherwise appropriate portions of the instruction: "the context of the court's remarks makes it clear that no coercive effect was intended or likely to result." 688 F.2d at 511–512. We also noted that the comment favored neither side and did not indicate that expediency should prevail over jurors' convictions. 688 F.2d at 512.

In *United States v. Allen,* 797 F.2d 1395, 1398–1400 (7th Cir.), *cert. denied,* 479 U.S. 856, 107 S.Ct. 196, 93 L.Ed.2d 128 (1986), we again engaged in a "plain error" review of a supplemental instruction and held that the district court's variation from the language approved in *Silvern* did not change the import from that intended in *Silvern.* The district court's instruction told the jurors to make every effort to reach a verdict, but did not say that they should do so only if a verdict could be reached "without violence to individual judgment," or that each juror should decide the case individually. Without expressly saying so, we approved the modified *Silvern* instruction set forth in Federal Criminal Jury Instructions of the Seventh Circuit 7.06 (1980).

Against this backdrop, we turn to the supplemental instruction given in this case, repeating that we review the instruction only for plain error because Mr. Rodriguez did not object to the district court's choice of words. Fed.R.Crim.P. 52(b). Under this standard of review, we have no authority to review the claim if the error was not both plain and prejudicial (or, if not prejudicial, somehow otherwise affecting substantial rights); we do not exercise our discretion to notice the claimed error unless the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Olano,* —— U.S. ——, —— – ——, 113 S.Ct. 1770, 1777–1779, 123 L.Ed.2d 508 (1993).

Setting aside, for the moment, the instruction's offer of additional reading of testimony and the transition to the modified *Silvern* instruction, we find nothing in the court's supplemental instruction that varies from the import (as distinct from the precise language) of the instruction approved in *Silvern.* Consistent with *Silvern,* the district court's supplemental instruction told the jurors: (1) to make every reasonable effort to reach a verdict; (2) to consult with each other in doing so; (3) to listen (indeed, to "listen carefully") to other jurors' opinions; (4) not to hesitate to change their minds; (5) not to surrender honest beliefs still thought to be correct; and (6) that jurors are impartial judges of facts, not advocates.

The district court did not tell the jury that the verdict must represent each juror's considered judgment and be unanimous, but the note that triggered the supplemental instruction shows the jurors knew those things. The district court did not tell the jurors not to surrender honest beliefs only because of other jurors' opinions or to return a unanimous verdict, or that the jurors' sole interest is to determine the truth (or, in the pattern instruction's more accurate phrasing, whether the government has proved its case beyond a reasonable doubt). The supplemental instruction should have included these points. Nonetheless, when viewing the instruction as a whole, we do not believe that the omission of these points changed the balance struck by the language approved in *Silvern* in such a way as to be more coercive of unanimity, or to place expediency over the jurors' conscientious views of the sufficiency of the evidence.

In moving from the offer of additional reading of testimony—the advice sought by Mr. Rodriguez—to the *Silvern* subject matter, the district judge made a statement which, in hindsight, appears unfortunate: "I know how hard you have worked and how diligently you've attempted to reach a verdict in this matter; I just hate to have it—have you go home without being able to reach a verdict." Standing alone, this sentence appears to be coercive; a reasonable juror might think it important to achieve unanimity to please a judge who would "hate to have" a deadlocked jury.

When the supplemental instruction is viewed as a whole, however, we do not believe that the jury would have perceived this sentence as encouraging a verdict at the expense of beliefs on the weight of evidence. The judge made this statement in the course of urging the jury, not to agree on a verdict, but rather to ask for any information the court could provide. It is quite evident to us that the judge was telling the jury that he would hate to have the jury go home if further available information could have assisted their deliberations. We do not believe it is improper for a trial judge to encourage a jury in its third day of deliberations to ask for helpful information. We also note that the judge gave his modified *Silvern* instruc-

tion immediately after the challenged statement.

It would have been preferable for the judge to have couched that encouragement in different terms; had Mr. Rodriguez objected to the judge's choice of words, the judge might have clarified his meaning. That no such objection was made suggests that counsel understood the judge as we do, and illustrates the reason for our use of the "plain error" standard of review.

Our holding with respect to the "hate to have it" comment is not unprecedented. In *General Leaseways, Inc. v. National Truck Leasing Ass'n*, 830 F.2d 716, 730 (7th Cir. 1987), the district court told the jury, when interrupting their deliberations for a weekend recess, that, "So much time has been invested in this trial, however, and the prospect of retrying it is so distasteful to everybody—including myself, I might add—that we have been struggling for some way to see if a verdict can be reached without unnecessarily pressuring you or interfering with your ability to reach your verdict fairly and considerately." Viewing this comment in the context of all the judge's remarks, including the rereading of a *Silvern* instruction when court reconvened, we found no coercion or prejudice.

We close this discussion by repeating the observation of the *Silvern* court: "Experience has now shown that variants in language or supplements or additions serve merely to proliferate appeals." 484 F.2d at 883. We continue to urge district courts to hew to the *Silvern* instruction as written or as modified in our pattern instructions. Nonetheless, we do not believe that the district court's variations in this case strayed from the meaning of language we have approved, or that the district court's instruction pressured jurors to set aside their beliefs.

## C. The Sentence

Finally, Mr. Rodriguez appeals his sentence. Mr. Rodriguez had two prior controlled substance convictions before embark-

ing on the charged conspiracy in 1989.[2] 21 U.S.C. § 841(b)(1)(A) requires life imprisonment for such a person whose violation of 21 U.S.C. § 841(a)(1) involves 1,000 kilograms or more of a mixture or substance containing a detectable amount of marijuana. The district court found that Mr. Rodriguez's activities involved more than 1,000 kilograms of marijuana, and so sentenced him to life imprisonment. Mr. Rodriguez challenges that finding. He first argues that the jury should have been required to determine the quantity of marijuana involved in the conspiracy; for the reasons discussed above, we disagree, and turn to his other arguments.

*1. The Standard of Proof*

Mr. Rodriguez next argues that the drug quantity's impact upon the sentencing decision in his case is so great that the preponderance of the evidence standard is inadequate; he maintains that in a case such as his, the government should be required to prove the requisite drug quantity beyond a reasonable doubt, rather than by a preponderance of the evidence.

Mr. Rodriguez's argument might be viewed as foreclosed by our decision in *United States v. Reynolds,* 900 F.2d 1000 (7th Cir.1990), in which we held that for purpose of the mandatory minimum sentences of 21 U.S.C. § 841(b) as applied to drug conspiracy convictions, drug quantities must be proven by a preponderance of the evidence, rather than by any higher standard. We have regularly and repeatedly affirmed this standard for determining drug quantities under the sentencing guidelines. *See, e.g., United States v. Salinas,* 62 F.3d 855, 858–59 (7th Cir.1995); *United States v. Saulter,* 60 F.3d 270, 278 (7th Cir.1995).

Mr. Rodriguez relies on the Third Circuit's opinion in *United States v. Kikumura,* 918 F.2d 1084 (1990). Mr. Kikimura's pre-departure sentencing range was 27 to 33 months' imprisonment; based on a number of aggravating factors inadequately considered by the Sentencing Commission, the sentencing judge departed upward to a sentence of 30 years' imprisonment—a twelve-fold increase equivalent to a twenty-two level upward departure. 918 F.2d at 1094, 1097–1098. The Third Circuit concluded that with so great a departure, Mr. Kikumura's was the rare case in which the sentencing "tail wags the dog of the substantive offense," *McMillan v. Pennsylvania,* 477 U.S. 79, 84, 106 S.Ct. 2411, 2415, 91 L.Ed.2d 67 (1986), requiring use of a standard of proof greater than that applicable to more pedestrian sentencing issues.

Our decisions implicitly have agreed with *Kikumura* to the extent that due process considerations may, at some point, require a greater showing for a dramatic increase. We have not, however, addressed any case in which that point had been reached. We considered *Kikumura* in *United States v. Schuster,* 948 F.2d 313, 315–316 & n. 3 (7th Cir. 1991), and held that the difference between the 21 to 27 month guideline range and the 5–year sentence imposed pursuant to a statutory mandatory minimum was not so "extraordinary" as to justify the use of a higher standard of proof. In *United States v. Trujillo,* 959 F.2d 1377, 1382 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 277, 121 L.Ed.2d 204 (1992), we concluded that the difference between a sentence of 115 months and a sentence of 168 months (reflecting a six-level difference in offense level) was "not so extreme or dramatic as to invoke *Kikumura* scrutiny."

Whether Mr. Rodriguez's life sentence is sufficiently extreme or dramatic an increase over other possible sentences depends on the point chosen for comparison. Mr. Rodriguez concedes having given Cook ten ounces of marijuana [3] and argues that the jury might have found him guilty of nothing more than that. The difference between ten ounces and 2,200 pounds is dramatic, as is the resultant difference between a life sentence and a sentencing range of 18 to 24 months for offense level 8 (250–999 grams of marijuana) and

---

**2.** Mr. Rodriguez was convicted in 1977 of possession with intent to distribute heroin and in 1983 of conspiracy to possess with intent to distribute more than 400,000 Mandrax tablets.

**3.** Mr. Rodriguez says he did so merely to lull Cook as part of stealing money Cook had advanced for marijuana Mr. Rodriguez did not intend to produce, which we discuss in greater detail in the next section of this opinion.

criminal history category VI. Conceding that there were other quantities the jury could have found to have been part of the conspiracy that would have elevated his offense level to 17, Mr. Rodriguez argues that the difference between his sentencing range at that level (51 to 63 months) still is extraordinarily different than his life sentence.

These differences between what was done and what might have been done, however, do not distinguish Mr. Rodriguez's case from any other drug case. Even setting aside the quantity-driven minimum sentences required by 21 U.S.C. § 841(b)(1), the sentencing range in any federal controlled substance offense depends on the quantities involved. *See* U.S.S.G. § 2D1.1(c). For a category VI offender such as Mr. Rodriguez, (and ignoring, for the moment, the provisions of U.S.S.G. § 4B1.1), the milestones are progressive: the first kilogram of marijuana produces a sentencing range of 24 to 30 months; the fifth kilogram increases the range to 37 to 46 months; at 50 kilograms, the range becomes to 70 to 87 months; at 250 kilograms, he reaches a range of 120 to 150 months; at 1,000 kilograms, the range becomes 210 to 262 months; at 10,000 kilograms, the Category VI offender faces a sentencing range of 324 to 405 months.

None of these incremental increases in sentencing exposure is sufficient alone to be so "extraordinary" as to trigger a heightened burden of proof, but if the intermediate steps are ignored, the leap from 24–30 months to 324–405 months is precisely the difference considered in *Kikumura*. Were we to apply the *Kikumura* rationale to drug quantity determinations under the sentencing guidelines, we would face the anomaly of saying that the prosecution must present clear and convincing evidence if a defendant disputes the entire 10,000 kilograms of marijuana, but if the defendant concedes the first 1,000 kilograms, the government need only establish the next 9,000 kilograms by a preponderance of the evidence. If the drug quantity is the tail that wags the dog of the substantive offense,

we cannot say when the dog begins to be wagged.

*Kikumura*, it must be remembered, involved a departure from the sentencing range produced by the sentencing guidelines, while the guidelines themselves provide for progressively more severe penalties as drug quantities increase. We do not hold, because we need not do so in this case, that the reasoning of *Kikumura* never will apply to enhancements dictated by the sentencing guidelines, but the *Kikumura* reasoning seems better suited to a decision to treat a defendant differently from other similarly situated defendants.[4] We hold only that *Kikumura* does not alter the traditional burden of proof in this case.

In reaching this conclusion, we recognize that this is not a case in which the sentencing guidelines are directly relevant. The guidelines did not produce Mr. Rodriguez's life sentence; he was sentenced to life imprisonment because 21 U.S.C. § 841(b)(1)(A) requires that sentence for an offense involving 1,000 kilograms of marijuana and a defendant with two prior federal drug convictions. Nonetheless, the sentencing guidelines would have allowed Mr. Rodriguez to be sentenced to life imprisonment: U.S.S.G. § 4B1.1(A) prescribes an offense level of 37 and a criminal history category of VI for Mr. Rodriguez, producing a sentencing range of 360 months to life imprisonment. *McMillan v. Pennsylvania*, 477 U.S. 79, 88, 106 S.Ct. 2411, 2417, 91 L.Ed.2d 67 (1986), forecloses any holding that the legislature cannot, without requiring a heightened standard of proof, make mandatory that which otherwise is discretionary.

■ The government was required to prove, by a preponderance of the evidence, that the offense of conviction involved 1,000 or more kilograms of marijuana. It was not required to do so by clear and convincing evidence or by proof beyond a reasonable doubt.

---

**4.** Even then, such an analysis rarely will be needed in light of our requirement that departures be "structured" on the guidelines' enhancement model. *See, e.g., United States v. Hogan*, 54 F.3d

336, 342 (7th Cir.1995). This requirement reduces the likelihood of dramatic and extraordinary increases in sentencing exposure.

### 2. Sufficiency of Evidence of 1,000 Kilograms

■ Mr. Rodriguez contends that the evidence was insufficient to support a finding, under any standard, that 1,000 or more kilograms of marijuana were involved in the conspiracy of which he was convicted. In this argument, Mr. Rodriguez faces the arduous task of persuading us that the district court's factual findings were clearly erroneous—that no reasonable factfinder could have believed that 1,000 kilograms were involved. *United States v. Claiborne*, 62 F.3d 897, 901 (7th Cir.1995); *see generally Anderson v. City of Bessemer City*, 470 U.S. 564, 574–576, 105 S.Ct. 1504, 1511–13, 84 L.Ed.2d 518 (1985). Mr. Rodriguez has not met this burden.

■ We begin by noting that the standard for determining the quantity of controlled substances "involved" in a conspiracy for purposes of the mandatory life sentence in 21 U.S.C. § 841(b)(1)(A) is not precisely the same as the "relevant conduct" approach ordinarily used in determining drug quantities under the sentencing guidelines, U.S.S.G. §§ 1B1.3, 2D1.1(c). While the guidelines look to behavior that was part of the same course of conduct as the offense of conviction, U.S.S.G. § 1B1.3, the statute looks "only to the conduct which actually resulted in a conviction under that statute." *United States v. Darmand*, 3 F.3d 1578, 1581 (2d Cir.1993). In conspiracy cases, however, the inquiries become quite similar because under the traditional approach to co-conspirator liability, one conspirator is criminally liable for other co-conspirators' acts done in furtherance of the conspiracy and reasonably foreseeable as a necessary or natural consequence of the conspiracy. *United States v. Irvin*, 2 F.3d 72, 77–78 (4th Cir.1993), *cert. denied sub nom., Gonzalez v. United States*, —— U.S. ——, 114 S.Ct. 1086, 127 L.Ed.2d 401 (1994); *United States v. Young*, 997 F.2d 1204, 1210 (7th Cir.1993); *see Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Accordingly, while our analysis resembles the "relevant conduct" inquiry under U.S.S.G § 1B1.3, we actually proceed under *Pinkerton.*

The district court found that from May 1989 to January 1990 (except for two drought-plagued months), Mr. Rodriguez and his brothers sent 150 to 250 pounds of marijuana every two or three weeks to the Milwaukee-based Michael Cook. The court found 1,800 pounds of marijuana (nine loads averaging 200 pounds each) as a result of those shipments. The district court further found that Mr. Rodriguez personally was involved in an additional 200–pound shipment that gave rise to a price dispute between the suppliers and distributor, bringing the total to 2,000 pounds. Finally, the district court found that Mr. Rodriguez promised, and undertook to provide (though he never actually provided), a 500–pound shipment for which Mr. Cook paid $100,000, bringing the total to 2,500 pounds of marijuana, which exceeds 1,000 kilograms.

Mr. Rodriguez makes several factual arguments in support of his attack on the sufficiency of the evidence. He contends that his brothers ran a marijuana business until the brothers turned their customer, Michael Cook, over to Mr. Rodriguez in March 1990, when Mr. Rodriguez claims he made his first appearance. Thus, he argues, his brothers' 1989 transactions with Mr. Cook cannot (since Mr. Rodriguez was not a part of the conspiracy in 1989) be attributed to him (or, in the terms of the statute, cannot have been "involved" in his offense of conviction).

■ The court cannot, of course, reweigh the evidence that was before the sentencing judge, *United States v. Yanez*, 985 F.2d 371, 378 (7th Cir.1993), which included the evidence presented at trial. That evidence is sufficient to allow the sentencing judge, sitting as a factfinder, to find that Mr. Rodriguez was part of his brothers' marijuana distribution enterprise in 1989: Mario Gonzalez testified at trial to seeing Mr. Rodriguez's brother hand Mr. Rodriguez money from a 1989 drug transaction the brother had conducted, to hearing Mr. Rodriguez complain in 1989 that Cook's payments to his brothers were usually "short", and to receiving instruction from Mr. Rodriguez in 1989 when Mr. Gonzalez had attempted to telephone Mr. Rodriguez's brother. From this evidence, the court reasonably could find that

the 1989 deliveries to Cook were reasonably foreseeable to Mr. Rodriguez.

Mr. Rodriguez also argues that he never intended to provide 500 pounds to Cook in 1990, but rather simply intended to keep his half of the $100,000 Cook gave Gonzalez as payment for that amount. The sentencing judge could have so found in light of Mr. Rodriguez's failure to produce even a pound of marijuana despite months of collection efforts by Cook and Gonzalez, but the record also supports the judge's finding that, whatever Mr. Rodriguez may have decided to do later, Mr. Rodriguez intended to perform when the agreement was made. The district court was free to believe either of these plausible interpretations of the evidence.

Finally, the record supports the district court's findings as to the number and size of the 1989 deliveries. Cook testified that deliveries began in February 1989 and continued through February 1990. He testified that loads would arrive every three to four weeks, but more detailed testimony by Cook and Gonzalez reflects loads arriving, on occasion, ten days apart. Cook testified that he received loads of 100 to 150 pounds, and Gonzalez testified that the loads ranged from 100 to 200 pounds, but the more detailed trial testimony reflects several loads in excess of 200 pounds. Recognizing that drug dealers ordinarily do not use invoices and bills of lading, we have held that sentencing courts may make reasonable estimates as to drug quantities. *United States v. Johnson*, 997 F.2d 248, 255 (7th Cir.1993); *see, e.g., United States v. Carter*, 999 F.2d 182, 187 (7th Cir. 1993). The district court's findings were reasonable estimates.

### D. Conclusion

For the foregoing reasons, Mr. Rodriguez's conviction and sentence are AFFIRMED.

---

* Counsel for the petitioner filed a motion to waive oral argument pursuant to Fed.R.App.P. 34(a) and (f) and Circuit Rule 34(f). Neither the petitioner nor counsel for the respondent objected to a waiver. Accordingly, we granted the motion and the appeal was submitted on the briefs and the record.