# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 00-4184 & 00-4214

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DANNY SMITH and HARRY D. LOWE,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Western Division.
No. 99 CR 50022—**Philip G. Reinhard**, *Judge.*

———————

ARGUED OCTOBER 23, 2001—DECIDED OCTOBER 16, 2002

———————

Before HARLINGTON WOOD, JR., CUDAHY, and KANNE, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Harry Lowe and Danny Smith were convicted by a jury of several counts of conspiracy and possession of marijuana with intent to distribute, in violation of 21 U.S.C. §§ 841, 846. During the tax years in question, Lowe had substantial income, presumably from drug trafficking, which he failed to report as income, in violation of 36 U.S.C. § 7203. The defendants appeal on several grounds related to whether they were given a fair trial and whether the district court erred in determining their criminal sentences. We affirm.

## I.

This appeal involves two criminal defendants and numerous alleged errors by the district court. Therefore, we must discuss the facts of the case in some detail. This narrative follows a simple chronology: the drug transactions leading to Harry Lowe's arrest, the events leading authorities to Danny Smith, the seizure of a large amount of cash from Lowe's residence (which forms the subject of his tax crimes) and the subsequent trial and sentencing proceedings.

## A.

The conspiracy charges against defendants Lowe and Smith arise from several drug transactions that took place from the early to the late 1990s. They can be separated into four episodes: (1) the purchase of marijuana from Jose Rubalcava; (2) the purchase of marijuana from Gerardo Rivera via co-conspirator Edwin Rivas; (3) the purchase of marijuana in a deal Rivas brokered with suppliers in Texas and Mexico and (4) the purchase of marijuana from a supplier in Arizona.

### 1. Marijuana from Rubalcava.

In the early 1990s, a home remodeler named Stuart Swick, a co-conspirator and eventual prosecution witness, was working at the home of his friend Harry Lowe, a.k.a. Wayne Lowe, the owner of a used car lot. Swick and Lowe discussed one of Swick's other clients, Jose Rubalcava. Swick had observed Rubalcava moving garbage bags from the trunk of his car into his home, and Swick inferred that Rubalcava was trafficking in marijuana. This piqued Lowe's interest, and he asked Swick to find out if Rubalcava would be willing to sell him several pounds

of marijuana, and if so, at what price. According to testimony at trial, a deal was struck for five pounds of marijuana (approximately 2.3 kilograms) for $5,000. Several weeks later, Lowe gave Swick $10,000 to arrange another deal with Rubalcava, this time for ten pounds of marijuana (about 4.6 kilograms).

During 1992, Lowe and Swick continued to make purchases from Rubalcava. Swick observed that some of the cash supplied by Lowe came from a safe buried in the dirt floor of Lowe's basement. In the summer of 1992, Lowe enlisted his cousin, Tom Lones, in a plan to make a $50,000 "down payment" on 300 pounds (140 kilograms) of marijuana from Rubalcava, never intending to pay the balance. The plan failed when Rubalcava delivered the first 90 pounds but refused to deliver any more until he was paid. Apparently, the buyers ceased dealing with Rubalcava from that time forward.

### 2.  Marijuana purchased from Rivera.

Lowe had another opportunity to traffic in large quantities of marijuana in 1994. According to testimony at trial, the business manager for Lowe's car lot, Greg Fitzgerald, met a customer named Edwin Rivas. Fitzgerald found out that Rivas had acquaintances in the drug importation business and set up a meeting between Lowe and Rivas. At the meeting, Lowe asked Rivas if he knew of any sources for marijuana or cocaine, and Rivas contacted Gerardo Rivera on Lowe's behalf. Thereafter, Rivas acted as a courier for Lowe, exchanging large amounts of cash for marijuana. The first transaction was for 50 pounds (or 23 kilograms) at $35,000, and Rivas was usually given $300 to $400 for his efforts.

### *3. Marijuana from Texas and Mexico.*

In the summer of 1994, Lowe asked Rivas to go to Laredo, Texas, and negotiate a deal with a Spanish-speaking marijuana source. Rivas agreed. Once in Laredo, Rivas met with two individuals and negotiated a deal to acquire 50 kilograms of marijuana for $475 per kilogram. Rivas contacted Lowe, who accepted the deal. Rivas then returned to Rockford, picked up $23,000 from Lowe, and brought it to Texas. The first shipment of marijuana arrived in Rockford a short time later.

Following this transaction, Rivas traveled to Laredo again, this time accompanied by Lowe. They were taken to Mexico and introduced to a person called "Rogilo" with whom they negotiated new terms. The deal made at that meeting set up a regular shipment of 300 pounds (about 140 kilograms) of marijuana to Rockford at $275 per pound ($605 per kilogram, or about $82,000 per shipment). According to testimony at trial, this arrangement resulted in approximately ten 300-pound shipments of marijuana to Rockford between 1994 and 1996.

The marijuana was transported by sealing it in the gasoline tanks of pick-up trucks. The trucks were driven to Rockford, where the drivers would stay at a local hotel. Lowe would drive the trucks from the hotel to his dealership or to an auto body shop owned by his friend (and co-defendant) Danny Smith. They would remove the gas tanks and cut them open to access the marijuana. Containers filled with payments of $100,000 or more were then welded inside new tanks, which in turn were installed on the trucks and returned to the drivers. Danny Smith's business partner at the body shop, James Petrow, who subsequently testified at trial, witnessed this activity several times, and once assisted Smith in dividing marijuana into smaller units and packaging it in bags. The bags were kept in a freezer at the rear of

the body shop, and buyers would periodically stop by to pick up marijuana and drop off money.

### 4. Marijuana from Arizona.

In November of 1995, Rivas bought a van from Lowe's lot. A few months later, Lowe asked Rivas to drive the van to Arizona to pick up some marijuana. Rivas again agreed. He drove the van to a hotel in Tucson, where Lowe's contact picked up the van to load it with drugs. The van was returned the next day and Rivas was shown how marijuana had been hidden behind the van's interior rear panels. On the return trip, the Nebraska State Police stopped Rivas. Rivas consented to a search, and a trooper found 115 pounds of marijuana (about 50 kilograms). Rivas was then placed under arrest.

Rivas agreed to cooperate with DEA officials. The DEA sent Rivas on a controlled delivery to Lowe's car lot, using recording and surveillance equipment. Rivas pulled into the garage of Lowe's facility, showed Lowe how the marijuana could be accessed, and asked to receive one pound of marijuana in partial payment of his $5,000 courier fee. Rivas then borrowed a car from Lowe and drove a short distance, where he turned over the marijuana and a recording device to DEA agents. Shortly thereafter, Lowe left the car lot. However, because he was driving very fast, DEA agents were unable to follow. Lowe's vehicle was subsequently found outside Danny Smith's auto body shop, but when Lowe left the lot, he once again drove too fast for authorities to maintain surveillance. That evening, Lowe was finally arrested as he left a tavern owned and operated by his father. A search warrant was obtained to search Lowe's car lot facilities. The search recovered 63 packages suspected of containing drugs, 52 of which were chemically tested and determined to contain marijuana weighing 35 kilograms (about 75

pounds). A loaded shotgun was on the premises and accessible at the time of the search.

### B.

Lowe was released on bond shortly thereafter. Smith and Lowe still possessed large amounts of marijuana, which Smith placed in the trunk of a Saab at the body shop. The auto body shop had purchased the Saab from Lowe's car lot. One week after Lowe's arrest and release, Lowe asked Swick to do him a favor and to get instructions from Smith. Smith directed Swick to pick up the Saab at the auto body shop and to lock it in Swick's garage. Eventually, Smith also directed Swick to remove a marijuana-filled duffle bag from the trunk of the Saab and to lock it in a freezer that was also located inside the garage. Periodically over the next year, Lowe would direct Swick to transport quantities of this marijuana to Smith's body shop. On one occasion in March of 1997, Swick delivered nine pounds to Smith.

In April 1997, the police department of Loves Park, Illinois, received a tip that Swick was storing a large quantity of marijuana in a freezer at his residence. The police then visited Swick's home, and Swick voluntarily agreed to a search. Both Swick and Tom Lones, who was Lowe's cousin and the owner of Swick's rented home, disclaimed ownership of the locked freezer in the garage. The authorities impounded the freezer and transported it to State Police headquarters. It was then opened and found to contain almost 18 pounds of marijuana. A fingerprint examiner inspected the packages of marijuana, finding Lowe's fingerprints on one and Smith's on another.

### C.

On December 3, 1997, a search warrant was executed at Lowe's residence, simultaneously with the execution

of a seizure warrant based on a civil forfeiture complaint. Several documents were seized, including some items that were improperly catalogued.[1] In addition to numerous firearms, Police seized a safe buried in the basement floor, of which Lowe denied knowledge. The safe contained more than $100,000 in cash. Although Lowe had earned income during 1995 and 1996, he did not file tax returns for those years until December 12, 1997, shortly after the search and seizure.

According to testimony at trial, Lowe approached Vincent Lloyd, an accountant, in March of 1998 for his assistance in reviewing and correcting his tax returns as far back as 1993. The Government asserts that because this review and correction took place so soon after the search and seizure, they raise a legitimate suspicion that Lowe was trying to protect some of his assets from forfeiture.

### D.

Smith and Lowe were indicted by a federal grand jury in June 1999. Count 1 charged both Smith and Lowe with conspiring to distribute in excess of one hundred kilograms of marijuana, a Schedule I Controlled Substance, in violation of 21 U.S.C. § 841(a)(1). Counts 2 and 3 charged Lowe with conspiracy to distribute "approximately fifty-two kilograms" and "approximately 1038 grams" of marijuana, respectively. Counts 4, 5 and 6 charged Lowe with making false statements on his tax returns for 1994,

---

[1] The apparent lack of orderly police procedure with respect to certain documents seized from Lowe's home forms the basis for Lowe's unsuccessful "chain of custody" argument discussed in Section II.A.3, *infra.*

1995 and 1996, in violation of 26 U.S.C. § 7606(1).[2] Counts 7 and 8 charged Lowe with willful failure to file timely tax returns for 1995 and 1996, in violation of 26 U.S.C. § 7206(1). A jury trial followed.

Before the government commenced its case, Lowe objected to joinder of the tax and drug charges. Lowe argued that these charges were unrelated and should be severed to avoid unfair prejudice. The district court denied the motion for severance and the trial went forward.[3] After the government presented its case-in-chief against Lowe but before Lowe began his defense case, the district court informed counsel for Smith that any cross examination by him of Lowe's defense witnesses would be limited to matters that pertained to his client, Danny Smith. The district court judge said that he wanted to avoid jury confusion by limiting the possibility that counsel for Smith would attempt to develop his own case during the cross examination of Lowe's defense witnesses. Instead, counsel for Smith was instructed that he could explore a broader line of inquiry if he called these witnesses for direct examination during his client's defense. Counsel for Smith then consented to this procedure.

Testifying in his own defense, Lowe stated that his trip to Texas with Rivas was merely to repossess a car he had sold, and that his sponsorship of Rivas' trip to Arizona was merely a gesture intended to benefit Rivas. Upon Rivas' return to Rockford, Lowe testified that Rivas left his van at the car lot for repair. Lowe also denied any drug trafficking with Swick and claimed that the red

---

[2] On the government's motion, Count 4 was dismissed prior to trial, and Counts 5 and 6 were dismissed during trial.

[3] As the government points out, Lowe did not renew his objection at the close of evidence.

Saab in fact belonged to Danny Smith's auto body shop and was used primarily by James Petrow. Lowe also testified that he failed to file returns for 1995 and 1996 because he had fallen behind in the early 1990s, was afraid of the consequences and did not know how to correct the situation. Danny Smith subsequently testified that James Petrow was his business partner in the auto body shop business from October 1993 to March 1997. At that time, Petrow's irresponsibility with money had caused the business to struggle. According to Smith, Petrow withdrew business funds for personal use, thus putting the shop itself in a precarious financial situation. When the business partnership ended, Smith changed the locks at the body shop. Smith also testified that he had never engaged in drug trafficking, that he had never seen Edwin Rivas before trial and that he had never seen pickup trucks with marijuana in the gas tanks at his body shop. Smith did admit that he, with Lowe and Lones, once passed around one-pound packages of marijuana at Swick's house. Smith also conceded that he had smoked marijuana with Lowe and Lones, but he denied any involvement with or knowledge of the marijuana found in Swick's freezer.

Swick testified as well, and claimed that a written statement made by him and furnished to the authorities was based entirely on his own recollection and was written in his own words. Lowe attempted to impeach Swick by pointing out that the introductory paragraph of Swick's statement was substantially similar to a statement written by an investigating agent. The trial court refused to allow that line of questioning on cross, but evidence that the two statements were similar was introduced, with the agent admitting that the language was "boilerplate."

At one point during Petrow's testimony, the government asked if he remembered Lowe's arrest, referring to the

arrest for the charges in the present case. Petrow's answer referred to an arrest in Kentucky. The district court immediately ordered that the reference to Kentucky be stricken from the record, and the trial went on, notwithstanding a motion by Lowe for a mistrial.

On August 8, 2000, the jury convicted Smith and Lowe of conspiracy to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846. Lowe was also convicted of possession with intent to distribute marijuana, and distribution of marijuana, in violation of 21 U.S.C. § 841(a), and of willfully failing to file timely tax returns for 1995 and 1996, in violation of 26 U.S.C. § 7206(1). The jury also completed a special verdict form, which asked them to find the quantity of marijuana involved by selecting a weight range. The ranges on the form coincided with the ranges contained in 21 U.S.C. § 841(b)(1).[4] The jury selected 50 to 100 kilograms of marijuana for Lowe, and less than 50 for Smith. The indictment, however, specified marijuana amounts in excess of 1200 kilograms for Lowe and in excess of 100 kilograms for Smith.

At sentencing, the trial court found that Lowe's relevant conduct involved 528 kilograms of marijuana, and Smith's relevant conduct involved more than 100 kilograms. The court also made several findings that aggravated Lowe's sentence. U.S.S.G. §§ 2D1.1(b)(1) (presence of firearm), 3B1.1(a) (leadership role), 3C1.1 (obstruction), 4A1.1 (criminal history). Both defendants were sentenced

---

[4]  21 U.S.C. § 841(b)(1) varies the sentence for violation of § 841(a) according to the type and amount of the drugs involved in the violation. For marijuana, the ranges are: (A) 10 years to life for over 1000kg; (B) 5 to 40 years for 100 to 1000kg; (C) 20 years or less for 50 to 100kg and (D) five years or less for less than 50kg.

at the statutory maximum for the applicable drug range under § 841(b)(1). Smith was sentenced to 60 months in prison, which is the statutory maximum for an amount of marijuana less than 50 kilograms, § 841(b)(1)(D), and Lowe received 240 months, which is the statutory maximum for an amount of marijuana between 50 and 100 kilograms, § 841(b)(1)(C). The cases were consolidated into the matter now before the court. This appeal follows.

## II.

Lowe and Smith make several claims on appeal with Lowe presenting eight issues and Smith presenting two. Since many of these issues are related, we have once again organized our discussion chronologically. We first turn to both defendants' appeals from the district court's actions at trial, and then to issues related specifically to sentencing.

## A.

Lowe argues that the district court made the following errors at trial. First, he claims that the tax charges should have been severed from the conspiracy charges and tried separately. Second, he asserts that he should have been allowed to cross-examine Stuart Swick by demonstrating the similarity between his statement and an affidavit of Agent White. Third, he challenges the sufficiency of the chain of custody for documents seized pursuant to the search warrant, and questions whether they can be properly admitted into evidence. Fourth, he claims that a mistrial was necessary because James Petrow testified that Lowe was arrested in Kentucky. Finally, Lowe argues that the jury instructions created an impermissible risk that the jury's decision was not unanimous. Smith's only issue arising from the trial is

his claim that the district court improperly hindered his right to cross-examine Lowe and other witnesses who were testifying during Lowe's case-in-chief.

### 1.  *Motion to sever.*

Lowe claims that the district court erred in denying his motion to sever the tax counts. We review for abuse of discretion the district court's decision to deny a motion to sever the counts of an indictment. *See United States v. Stokes*, 211 F.3d 1039, 1042 (7th Cir. 2000).

Before trial, Lowe moved to sever the tax charges from the conspiracy charges, claiming that the evidence used to support the tax counts would unfairly prejudice the jury with respect to the drug charges. The trial court denied the motion, and Lowe did not renew his objection at the close of evidence. Citing case law that addresses the issue of severing criminal co-defendants, the government argues that Lowe waived any right he may have had to severance by failing to renew his motion to the district court. *See, e.g., United States v. Phillips*, 239 F.3d 829, 838 (7th Cir. 2001) (stating that, in the context of co-defendants, "a motion for severance is typically waived if it is not renewed at the close of evidence, primarily because it is then that any prejudice which may have resulted from the joint trial would be ascertainable") (quotations omitted); *United States v. Cooper*, 942 F.2d 1200, 1205 (7th Cir. 1991) (same); *United States v. Caudill*, 915 F.2d 294, 298 (7th Cir. 1990) (same). Lowe maintains, however, that unlike a motion for severance of defendants, where the actual content and effect of testimony is largely unknown until it is presented, the documentary evidence that formed the basis for the tax counts could be fully assessed prior to trial. Therefore, a renewal of his original objection was unnecessary. Although Lowe

fails to cite any authority to support his position, his reasoning is at least plausible.

Nevertheless, we need not squarely address this issue because Lowe's substantive argument on severance clearly fails on the merits. Under Rule 14 of the Federal Rules of Criminal Procedure, a district court has discretion to order separate trials if it appears that a defendant will be prejudiced by trying the offenses together. Several factors reduce or eliminate the prejudicial effect of evidence, including the mutual admissibility and weight of the evidence at issue. *See, e.g.*, *United States v. Traeger*, 289 F.3d 461, 473 (7th Cir. 2002) (ruling that "mutually admissible" evidence—i.e., evidence that is admissible for either charge—is not prejudicial) (citing *United States v. Dijan*, 37 F.3d 398, 402 (8th Cir. 1994)); *United States v. Freeland*, 141 F.3d 1223, 1227 (7th Cir. 2000) (ruling that potential inference of criminal personality is not unfairly prejudicial when there is sufficient evidence to support all counts and the jury is instructed to consider the counts separately). In the interest of preserving judicial resources, a motion to sever should be granted only when there is a serious risk of unfair prejudice that deprives the defendant of a fair trial. *Stokes*, 211 F.3d at 1042; *United States v. Archer*, 843 F.2d 1019, 1021 (7th Cir. 1988); Fed. R. Crim. P. 14 (giving district court discretion to sever in order to avoid unfair prejudice to the defendant). We give "great deference" to the district court's decision as to the hazards of a joint trial. *Phillips*, 239 F.3d at 838; *see also United States v. Moore*, 115 F.3d 1348, 1361-62 (7th Cir. 1997) (stating that defendant bears "an extremely difficult burden" in showing that a district court abused its discretion when denying a Rule 14 motion to sever) (quoting *United States v. Moya-Gomez*, 860 F.2d 706, 754 (7th Cir. 1988)).

The evidence presented in Lowe's case is not prejudicial because it was "mutually admissible" for either the

tax or drug charges. *See United States v. Quilling*, 261 F.3d 707, 715 (7th Cir. 2001) (holding that " 'prejudice requiring severance is not shown if evidence on the severed counts would be admissible in the trial of the remaining counts' ") (quoting *United States v. Rogers*, 475 F.2d 821, 828 (7th Cir. 1973)); *accord United States v. Windom*, 19 F.3d 1190, 1198 (7th Cir. 1994). Here, in an effort to prove that Lowe had unreported income, the government offered evidence of Lowe's assets amounting to an estimated $2.6 million, including cars, boats, real estate, recreational vehicles, home improvements and cash. The value of his assets and his lifestyle exceeded what might be achievable from Lowe's legitimate income from the used car lot. Lowe claims that the evidence of his wealth, presented to support the tax charges, would lead the jury to impermissibly consider it as evidence of a propensity for trafficking in drugs.

But it is well settled in this circuit that evidence of an unexplained, lavish lifestyle is probative of the existence of income derived from a drug conspiracy. *See United States v. Penny*, 60 F.3d 1257, 1263 (7th Cir. 1995) (ruling that "evidence of unexplained wealth is probative and therefore admissible if it creates a reasonable inference of the defendant's involvement in the drug conspiracy or trafficking") (internal quotations omitted); *Hogan*, 886 F.2d at 1507 (ruling that jury decides whether a defendant's wealth came from a legitimate income or criminal activity and that tax count can be joined with the criminal conduct count involving the source of the wealth). Even if the evidence might also suggest to a jury something adverse about Lowe's character, this evidence is admissible; it is circumstantially admissible to support an inference that Lowe had income from drug trafficking. The disputed tax evidence here was "mutually admissible," or overlapping, in that the government could have presented evidence of Lowe's extravagant lifestyle to sup-

port the drug conspiracy charges. Therefore, the denial of severance was not unfairly prejudicial nor an abuse of discretion.

Finally, the government voluntarily dismissed several of the tax-related counts after providing the evidence to support them. Lowe argues that this maneuver by the government gives weight to the thesis that the prosecution of the tax counts was a mere pretense or ruse to get Lowe's assets before the jury. But the government had a legitimate reason for dismissing some of the tax charges: it would have been difficult to pursue them because Lowe failed to produce essential documents in a timely fashion. Lowe cannot claim that the tax charges were a sham when he made a contribution to the need to dismiss them. The district court did not abuse its discretion in denying the motion for severance.

### 2. Cross examination of Swick.

Lowe argues that the district court abused its discretion when it refused to let Lowe's counsel use an officer's affidavit to impeach Stuart Swick during cross examination. In this case, an affidavit by law enforcement agent John White had a first paragraph that was virtually identical to an affidavit made by Swick, purportedly from memory. At trial, Swick testified that he created his statement entirely from his own recollection, and in his own words, and that he did not use any notes or other materials to compose his statement. Lowe's counsel wanted to impeach Swick with the White affidavit to demonstrate that Swick was being untruthful about the originality of his statement. The larger point he was attempting to make was that Swick, a member of the drug conspiracy, was motivated to lie about the conduct of other defendants in order to obtain a more favorable plea bargain.

Ordinarily, a district court's evidentiary rulings are reviewed for abuse of discretion. *United States v. Aldaco*, 201 F.3d 979, 985 (7th Cir. 2000). However, when the restriction implicates the criminal defendant's Sixth Amendment right to confront witnesses against him, which Lowe alleges here, the standard of review becomes de novo. *United States v. Cavender*, 228 F.3d 792, 798 (7th Cir. 2000); *United States v. Sasson*, 62 F.3d 874, 882 (7th Cir. 1995).

In general, the district court has wide latitude to impose limitations on cross examination. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *Sasson*, 62 F.3d at 882. Limitations on cross examination rise to the level of a Sixth Amendment violation when they prevent the exposure of a witness's bias and motivation to lie. *Van Arsdall*, 475 U.S. at 678-79. So long as the accused is given the opportunity to expose bias, further cross examination is at the discretion of the district court. *Sasson*, 62 F.3d at 882 (stating that a core goal of cross examination is to expose bias); *United States v. Nelson*, 39 F.3d 705, 708 (7th Cir. 1994) (stating that if the defendant is given the opportunity during cross examination "to expose a motive to lie, it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury"); *United States v. Robinson*, 832 F.2d 366, 373 (7th Cir. 1987) (ruling that district court may preclude "cumulative and confusing cross examination into areas already sufficiently explored to permit the defense to argue personal bias and testimonial unreliability"); *see also Cavender*, 228 F.3d at 798 (ruling that the district court can limit cross examination to prevent, among other things, repetitive or marginally relevant interrogation).

Here, Lowe was given ample opportunity to expose bias. Swick repeatedly testified that his written statement

was entirely his own. During Lowe's defense case, Lowe was able to call Agent White to the stand and elicit from him that, except for names, the same "boilerplate" language that Swick claimed as his own was included in Rivas' May 18, 1999, statement, Petrow's grand jury statement and Agent White's December 1997 affidavit. The court also permitted Lowe to argue to the jury that Swick lied about the preparation of the statement. Because Lowe was given ample opportunity to present issues of credibility and potential bias to the jury, further cross examination of Swick on the content of Agent White's affidavit was unnecessary. Further, the point of similarity applied only to the introductory paragraph of the two statements, not to its remaining substance. Hence, it was of only marginal significance. The district court's ruling is sustainable on either a de novo or an abuse of discretion standard.

### 3.  Chain of custody.

Lowe next asserts that the chain of custody for documents seized at his residence during the execution of the search warrant was so imperfect as to require denial of their admission into evidence. The thrust of Lowe's argument here is that these documents, which include self-authenticating receipts and communications, were not properly catalogued and could not be identified by the agents who conducted the search. Therefore, he believes that he is entitled to a new trial. We note at the outset that a district court's evidentiary rulings, including matters pertaining to the chain of custody, are reviewed for abuse of discretion. *United States v. Scott*, 19 F.3d 1238, 1244 (7th Cir. 1994).

Despite Lowe's protestations to the contrary, we believe that the defects pointed to by Lowe are relatively minor and do not raise serious issues of reliability. The

general standard for admissibility of evidence is that it be "in substantially the same condition as when the crime was committed." *United States v. Aviles*, 623 F.2d 1192, 1197 (7th Cir. 1980). A perfect chain of custody is not a prerequisite to admission. *See United States v. Brown*, 136 F.3d 1176, 1181 (7th Cir. 1998) (ruling that "lack of proof regarding a chain of custody does not render [audio]tapes inadmissible"); *United States v. Lott*, 854 F.2d 244, 250 (7th Cir. 1988) (ruling that "the government need not prove a perfect chain of custody for evidence to be admitted at trial"). Unless the defendant can point to evidence that specifically raises the issue of tampering, a presumption of regularity attaches to evidence that has at all times been kept in official custody, and any gaps in the chain of custody go to the weight of the evidence, not to its admissibility. *See United States v. Rivera*, 153 F.3d 809, 812 (7th Cir. 1998); *Brown*, 136 F.3d at 1181 ("[M]erely raising the possibility (however hypothetical) of tampering is not sufficient to render evidence inadmissible."). The documents in question here were in official custody at all times, and Lowe does not argue that they were no longer in their original condition, nor that they had been tampered with or were otherwise tainted. Therefore, the presumption of regularity attaches. The district court's chain of custody ruling is affirmed.

### 4. Motion for a Mistrial.

Lowe argues that the district court erred when it refused to grant him a new trial after Petrow made a reference to Lowe's arrest in an unrelated matter. During the trial, the government asked Petrow if he remembered Lowe's arrest in February of 1996, referring to the arrest in Rockford. Petrow responded that Lowe "was arrested in Kentucky a while back." Although the district

court immediately ordered that this statement be stricken from the record, Lowe moved for a mistrial. The district court denied the motion, but admonished the jury to disregard the testimony and to refrain from speculation on its meaning since it had no relevance to the current charges. We review the denial of a motion for mistrial for abuse of discretion. *See United States v. Wilson*, 237 F.3d 827, 836 (7th Cir. 2001).

At the outset, we note that jurors are presumed to follow limiting and curative instructions unless the matter improperly before them is so powerfully incriminating that they cannot reasonably be expected to put it out of their minds. *See Richardson v. Marsh*, 481 U.S. 200, 207-08 (1987). In *Richardson*, the Court focused on the extent to which the improper testimony criminally implicated the defendant and the likelihood that the jury would disregard the curative instruction. *Id.* Here, it is reasonable to believe that the jury could place the Kentucky arrest out of their minds, especially since it was unrelated to any of the other testimony at trial and was unadorned with additional details. This is not the type of striking testimony that would be engraved in the mind of the jury. The testimony is also insufficient to overcome the presumption that the jurors obeyed their curative instructions. The district court did not err in denying the motion for a mistrial.

### 5.  *The special verdict for quantity of marijuana.*

Lowe claims the district court abused its discretion when it asked the jury to determine the amount of marijuana by range rather than specifying an exact amount. Decisions by the district court regarding jury instructions are reviewed for an abuse of discretion. *United States v. Reed*, 227 F.3d 763, 770-71 (7th Cir. 2000). However, when the instructions are based on an error of law, we review de novo. *Savino v. C.P. Hall Co.*, 199 F.3d 925, 934

(7th Cir. 1999) (stating that jury instructions are reviewed de novo "to determine whether they provide fair and accurate summaries of the law").

Here, the district court, at the request of the government, provided jury instructions and verdict forms that required the jury to make special findings regarding the quantity of marijuana involved in the conspiracy count. This procedure is a byproduct of *United States v. Apprendi*, 530 U.S. 466 (2000), which held that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be proven beyond a reasonable doubt." *Id.* at 476. Because § 841(b) specifies four ranges of drug amounts that carry four different statutory maximum sentences, *see* note 4, *supra*, this court has mandated that "the trier of fact must be instructed to find, both the elements of the offense, as listed in § 841(a), and the drug amounts listed in § 841(b) that the prosecutor relies on to establish the maximum [statutory] penalty." *United States v. Trennell*, 290 F.3d 881, 887 (7th Cir. 2002); *see also United States v. Rodgers*, 245 F.3d 961, 965 (7th Cir. 2001) ("In the wake of *Apprendi*, it is clear that any finding as to a drug quantity that has the effect of increasing the statutory maximum prison term must be charged and submitted to the jury.").

While we believe that the district court's jury instructions complied with the requirements of *Apprendi*, the critique presented here is slightly different. Lowe claims that the quantity of drugs involved, under § 841(b)(1), is an element of the offense, and as such, the jury must unanimously agree on the *precise amount* of the drugs at issue. Lowe claims that the district court impermissibly provided in its instructions four *ranges* of drug amounts, which correspond to the four subsections of § 841(b)(1). Lowe argues that the district court erred when it rejected his special verdict form requiring the jury

to agree on the specific amount of marijuana Lowe conspired to possess. According to Lowe, the jury could have been divided over the occurrence of particular transactions involving different quantities of drugs. The jury instructions regarding range rather than specific drug amounts could have therefore resulted in a compromise verdict, with the jury divided over which transactions formed the basis of the conviction.

Although Lowe does not frame his argument in this way, he is essentially trying to advance two related, but ultimately discrete, legal theses: (1) that drug quantity is an element of a § 841 offense, and (2) that the jury must unanimously agree on the *precise* amount of drugs, rather than a range.

In this circuit, the answer to the first question is clear. Drug quantity is not an element of a § 841 drug offense. *See*, *e.g.*, *United States v. Trennell*, 290 F.3d 881, 887 (7th Cir. 2002) (stating that "drug quantity is not an element of the offense under § 841"); *United States v. Bjorkman,* 270 F.3d 482, 490-91 (7th Cir. 2001) (same); *United States v. Brough,* 243 F.3d 1078, 1080 (7th Cir. 2001) (same). An "element" of a criminal offense is ultimately a fact that must be charged in an indictment and proven beyond a reasonable doubt to support a conviction. *See Bjorkman*, 270 F.3d at 492; *see also Richardson v. United States*, 526 U.S. 813, 817 (1999) ("Calling a particular kind of fact an 'element' carries certain legal consequences. . . . [A] jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element.") (citation omitted). However, in the instance of § 841, if the jury instructions do not adequately address the amount of drugs the defendant conspired to possess with the intent to distribute, *Apprendi* limits the sentencing court to a period of incarceration at or below the default statutory maximum. *See United States v. Mietus*, 237 F.3d

866, 874 (7th Cir. 2001) (holding that *Apprendi* limited sentencing court to the default statutory maximum of five years, 21 U.S.C. § 841(b)(1)(D), when jury was instructed only to find whether the defendant possessed and conspired to possess a "measurable amount" of marijuana); *United States v. Westmoreland*, 240 F.3d 618, 632 (7th Cir. 2001) (same). If drug amount were a true element of § 841, then a failure by the jury to agree on the drug amount would mean that "there is *no offense at all*." *Bjorkman*, 270 F.3d at 492 (emphasis in original).

Lowe's second argument regarding range is integrally tied in with the requirements of *Apprendi*. In the present case, the indictment specified an amount of marijuana in the vicinity of 1200 kilograms. In addition, the special verdict revealed that the jury unanimously agreed that Lowe "conspired to possess with the intent to distribute more than 50 kilograms of marijuana, but less than 100 kilograms of marijuana." The statutory maximum sentence for this quantity of drugs is 20 years. *See* 18 U.S.C. § 841(b)(1)(C). We do not believe that, under *Apprendi*, the district court was required to take the additional step of asking the jury to return a specific finding of drug amount, which would ostensibly reflect the jury's agreement on the occurrence of specific drug transactions.

In this context, we believe that a precise drug amount in relation to a statutory range is analogous to the circumstance in which the jury unanimously agrees on the presence of a particular element but disagrees as to the method or means by which it arose. For example, in *Richardson*, the Court observed that "a federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element." 526 U.S. at 817. The Court then provided the following lucid example:

> Where, for example, an element of robbery is force or the threat of force, some jurors might conclude that

the defendant used a knife to create the threat of force; others might conclude that he used a gun. But that disagreement—a disagreement about means—would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely, that the defendant had threatened force.

*Id.*

If a simple robbery conviction can brook a modicum of disagreement as to means or method by which force was applied or threatened, so too can a conviction on a federal drug conspiracy that involved two defendants and numerous alleged transactions over a period of four years allow for some disagreement over the particular transactions that the conspiracy encompassed. Further, a ruling to the contrary would inevitably hamstring the government in its ability to effectively prosecute more complex drug conspiracies in which the alleged wrongdoings span decades and include thousands of discrete drug transactions. *See, e.g., United States v. Patterson,* 215 F.3d 776, 778 (7th Cir. 2000) (fifteen defendants in a decade-long conspiracy that grossed $40,000 a day), *vacated in part,* 531 U.S. 1033 (2000); *United States v. Boyd,* 208 F.3d 638, 640-41 (7th Cir. 2000) (five defendants in a "continuing and wide-ranging [narcotics] conspiracy reaching back to the mid-1960s"), *vacated,* 531 U.S. 1135 (2001).

In any event, Lowe's logic is fundamentally flawed in advancing the proposition that jury agreement on a specific amount of drugs would necessarily guarantee jury agreement about the particular transactions encompassed by the conspiracy. Juror A might be convinced of the occurrence of Transaction M, involving 2 kilos, Transaction N, involving 3 kilos and Transaction O, involving 4 kilos, for a total of 9 kilos. Juror B, on the other hand,

might have in mind Transaction P, involving 5 kilos and Transaction O, involving 4 kilos, again for a total of 9 kilos. That in each case the specific amount of drugs totaled 9 kilos would not assure jury unanimity on the specific transactions supporting the conviction. For all the reasons stated above, we hold that the district court's special verdict form, reflecting ranges of drug amounts under § 841(b)(1), was in accordance with law and not an abuse of discretion.

6.   *Limits on Smith's cross examination of Lowe's defense witnesses.*

Smith alleges that the district court improperly precluded him from cross-examining any of Lowe's witnesses, including Lowe, who presented testimony potentially adverse to Smith. As we noted earlier in connection with the limitations of Lowe's cross examination of Swick, a district court's evidentiary rulings are reviewed for abuse of discretion, *Aldaco*, 201 F.3d at 985, but the standard of review becomes de novo when an adverse evidentiary ruling implicates the defendant's Sixth Amendment right to confront witnesses, *Cavender*, 228 F.3d at 798.

Although resolution of this issue is quite straightforward, the following context is necessary to an understanding of Smith's meritless claim. Because this case involved a joint trial of Lowe and Smith, Lowe presented his defense before Smith. Before Lowe began his defense, the government inquired about the order of cross examination as between itself and Smith. The district court stated, "Well, [counsel for Smith] may cross as to anything related to his client, but otherwise he really is going to have to call him. . . . I think it's better to do it that way. Then the jurors will have it straight who is

being called by whom." During this exchange, Smith's lawyer commented, "I understand, Judge. That's fine."

The next day, counsel for Lowe presented impeachment evidence that suggested Swick might have observed large quantities of marijuana at Smith's body shop. Counsel for Smith requested a limiting instruction because the impeachment evidence should not be admitted against Smith on the conspiracy charges. The district court replied, "I understand that. The reason I limited you before is because I think you wanted to get out evidence that you thought might be helpful to your client, and I thought it was better to separate it from the other defendants. But if there's something that comes out that you think is adverse, I'll let you cross-examine." During the same exchange, Smith's counsel acknowledged that the inconsistency of statements made by Lowe's first two witnesses had been of minor importance and could be effectively addressed during his own direct examination. Smith's counsel then expressed concern about Lowe's subsequent witnesses, including Lowe himself. Yet, Smith's counsel did not request an opportunity to cross-examine either Lowe or his two remaining character witnesses.

Thus, as is apparent from the record, the major problem with Smith's argument is that counsel for Smith explicitly agreed to the court's handling of some of the witnesses and failed to assert his right to cross-examine others, despite the court's ruling that he "[might] cross as to anything related to his client." Cast in the light most favorable to Smith, any claim that the prescribed cross examination procedure infringed upon Smith's Sixth Amendment rights has either been waived or forfeited or some combination of the two. *See Penny*, 60 F.3d at 1261 (stating that constitutional prohibition against double jeopardy is waived "when there is the 'intentional relinquishment or abandonment of a known right'" and

that "the simple failure to assert a right–forfeiture–
is distinct from an intentional act–waiver") (quoting
*United States v. Olano*, 507 U.S. 725, 733 (1993)).

Waiver of a personally-held constitutional right "is not
reviewable," whereas forfeiture of that same right may
be reviewed for plain error. *Penny*, 60 F.3d at 1261. In
that respect, "[o]nly those errors that affect substantial
rights and 'seriously affect the fairness, integrity, or pub-
lic reputation of judicial proceedings' . . . amount to plain
error warranting reversal." *United States v. Haywood*, 70
F.3d 507, 511 (7th Cir. 1995) (quoting *Olano,* 507 U.S. at
732). Smith fails to point to a single example of how his
substantial rights were harmed by the cross examination
procedure prescribed by the court. Based on our review of
the record, the district court's handling of witnesses ap-
pears to have been quite sensitive to Smith's procedural and
substantive rights. The district court did not err in this
issue.

## B.

Lowe raises three issues on appeal as to sentencing, and
Smith raises one. Both defendants challenge the method
of the district court's fact-finding at sentencing. Lowe fur-
ther alleges that the district court erred in finding
the presence of a firearm, which raised his offense level. Fi-
nally, Lowe argues that the district court erred in deter-
mining his criminal history.

### 1. *Preponderance of the evidence standard at sentencing.*

Lowe alleges that the trial court improperly applied
the preponderance of evidence standard when determin-
ing the applicable amount of drugs under the Sentenc-
ing Guidelines. Lowe argues that a more demanding evi-
dentiary standard was warranted because the district

court's relevant conduct determination drastically increased his sentence beyond what he would have received if his sentence had been calculated using the smaller quantity of drugs found by the jury. Further, Lowe claims that *Apprendi* limits the trial court to finding the amount of drugs specified by the jury in the special verdict. When reviewing sentencing determinations under the Guidelines, we review the district court's legal conclusions de novo and its findings of fact for clear error. *United States v. Parolin*, 239 F.3d 922, 927-28 (7th Cir. 2000).

At the outset, we note that Lowe conflates the jury's factfinding role during trial with the district court's factfinding role during sentencing. To put it simply, the two fact finders make separate findings of fact for two distinct purposes. The adjudication of guilt is concluded once the jury finds the defendant guilty beyond a reasonable doubt. Then, during the sentencing phase, the judge assesses the facts under the relevant provisions of the Sentencing Guidelines and employs a preponderance of the evidence standard. *United States v. Zehm*, 217 F.3d 506, 511 (7th Cir. 2000); *Talbott v. Indiana*, 226 F.3d 866, 869 (7th Cir. 2000); U.S.S.G. § 6A1.3, cmt. (discussing preponderance of the evidence as the recommended standard). Here, Lowe claims that there were special circumstances that required the district court to depart from this usual framework. First, Lowe argues that a more exacting standard than preponderance must be applied when the court's factual findings as to drug amount markedly exceed the findings of the jury, thereby producing a much more severe sentence under the Sentencing Guidelines. Second, Lowe contends that *Apprendi* effectively caps the district court's findings as to the drug amount at the level determined by the jury.

Here, the jury found, by special verdict, that Lowe conspired to possess and distribute 50 to 100 kilograms

of marijuana. Under U.S.S.G. § 2D1.1, this amount would produce a base offense level of 24.[5] Under a preponderance of the evidence standard, the district court found that Lowe conspired to possess and distribute 528 kilograms of marijuana, setting the base offense level at 28. U.S.S.G. § 2D1.1(6). Both of these base offense levels would then be increased by adding 8 points relating to several adjustments, including presence of a firearm, obstruction of justice and Lowe's leadership role.[6] The smaller quantity of drugs (the jury determination) therefore results in a 32 offense level, which in turn produces a sentencing range of 151 to 188 months, given Lowe's Category III criminal history.[7] However, the district court relied on the larger drug amount to reach a 36 offense level, which produced a sentence of 240 months.

Lowe claims that the district court must apply a clear and convincing standard of proof when its findings of fact lead to a disproportionately large increase in a defendant's sentence (in this case, 52 months). To support his argument, Lowe directs our attention to *United States v. Rodriguez*, 67 F.3d 1312 (7th Cir. 1995), where we stated in dicta that a case might require a higher standard of proof when the finding at sentencing becomes

---

[5]  The categories under 21 U.S.C. § 841(b)(1) and U.S.S.G. § 2D1.1 do not directly coincide. A finding of 50-100 kg. of marijuana fits § 841(b)(1)(C) precisely, but spans three separate U.S.S.G. ranges: § 2D1.1(1) (40-60 kilograms); § 2D1.1(9) (60-80 kilograms) and § 2D1.1(8) (80-100 kilograms), resulting in a base offense level of 24. The district court acknowledged it would use the 80-100 kilogram category if it were to adopt the jury's finding.

[6]  The preponderance of the evidence standard is not an issue for these offense level adjustments. Lowe does challenge the firearm finding on different grounds. This issue is addressed below.

[7]  Lowe challenges his criminal history, which is also addressed as a separate issue below.

" 'the tail that wags the dog of the substantive offense.' " *Id.* at 1322 (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 84 (1986); *see also United States v. Hardin*, 209 F.3d 652, 654 (7th Cir. 2000) (stating in dicta that "perhaps in extreme circumstances . . . clear and convincing evidence would be the standard of proof for sentencing factors"), *vacated*, *Sallis v. United States*, 531 U.S. 1135 (2001). However, in the seven years since we decided *Rodriguez*, we have yet to find a sentencing disparity that warrants this heightened evidentiary standard. And certainly, there is nothing about Lowe's sentence that would cause us to break new ground today. *See, e.g., Rodriguez*, 67 F.3d at 1322-23 (finding preponderance of evidence appropriate for relevant conduct determination that extends sentence from 51-63 months to life in prison); *United States v. Masters*, 978 F.2d 281, 283-85 (same for sentence increase from 33-41 months to 40 years). Thus, although the principle of *Rodriguez* remains viable, it has no application to the case before us.

Lowe's *Apprendi* argument is also meritless. Under *Apprendi*, when a sentence was increased above the statutory maximum, the facts underlying it had to be submitted to the jury and proven beyond a reasonable doubt. 530 U.S. at 490; *United States v. Wallace*, 276 F.3d 360, 369 (7th Cir. 2002) ("[T]o the extent that a drug quantity affects a defendant's *statutory maximum sentence*, it is an aspect of the crime that . . . must be proven beyond a reasonable doubt") (emphasis added); *Brough*, 243 F.3d at 1079-80 (same); *United States v. Nance*, 236 F.3d 820, 825 (7th Cir. 2000) (same). Here, through the use of the special verdict form, the jury unanimously determined that Lowe conspired to distribute 50-100 kilograms of marijuana. Under § 841(b)(1)(C), the statutory maximum for that quantity of drugs is 20 years, which is the precise sentence (240 months) imposed here by the district court. Therefore, since the drug amount as determined by the

district court did not push the sentence beyond the statutory maximum, the district court correctly relied upon a preponderance of the evidence standard when making its sentencing determinations.

### 2. *Quantity of drugs attributed to Smith.*

Smith claims the district court's drug quantity finding at sentencing was clearly erroneous. A district court's finding as to drug quantity for sentencing purposes is reviewed for clear error. *See Westmoreland*, 240 F.3d at 629-30; *United States v. Bacallo*, 149 F.3d 717, 719 (7th Cir. 1998).

The thrust of Smith's argument is both simple and without merit. Smith asserts that the government put on evidence suggesting that he conspired to distribute several hundred kilograms of marijuana, yet the jury convicted him of an amount less than 50 kilograms. Smith maintains that this disparity between the amount alleged by the government and the amount found by the jury was inescapably a product of the jury having significantly discounting the credibility of Rivas, Petrow and Swick, who testified against Smith at trial. Since the district court's finding of 100 kilograms of marijuana rejected the collective wisdom of the jury and its implied credibility findings, Smith concludes that the district court committed clear error.[8]

---

[8] As in the case of Lowe, the district court's factual findings as to drug amount resulted in a sentence that was at the statutory maximum for a violation of 21 U.S.C. § 841(b)(1)(D) (specifying a maximum sentence of five years for engaging in a conspiracy to distribute 50 kilograms or less of marijuana). This provision corresponds, in terms of drug quantity, to the jury's findings on

(continued...)

However, as noted earlier, the district court's relevant conduct findings for sentencing purposes, including drug quantities, are governed by a less demanding evidentiary standard than are determinations by the jury. This is a fact of federal criminal procedure that Smith (unlike Lowe) does not contest. Nonetheless, he contends that even under this more lenient standard, the testimony of the government's three witnesses simply cannot support a drug quantity finding larger than 50 kilograms because this is what the jury found. But credibility determinations by the district court using the preponderance standard cannot be challenged on appeal unless the court credited testimony that was essentially unbelievable as a matter of law. *See United States v. Ray*, 238 F.3d 828, 834 (7th Cir. 2001). We give exceptional deference to district courts on issues of credibility in sentencing. *See Amadeo v. Zant*, 486 U.S. 214, 227 (1988); *accord United States v. Johnson*, 227 F.3d 807, 813 (7th Cir. 2000).

Smith fails to identify any factor in the record that would render the testimony of the government witnesses essentially unbelievable. While he does point out that some of this testimony was internally conflicting, the mere presence of such conflicts does not in itself amount to essential unbelievability nor support a finding of clear error. Deference to the finder of fact, with the opportunity to observe the witnesses, supports credibility findings even in the face of some internal conflicts. Thus, applying the preponderance standard, the findings of the district court, on which the sentence is based, are not clearly erroneous.

---

[8] (...continued)
the special verdict form.

### *3. Presence of a firearm in connection with the offense.*

Lowe argues that the district court erred when it imposed a 2-level enhancement for possession of a firearm in connection with the crime of conviction. *See* U.S.S.G. § 2D.1(b)(1). The possession of a firearm for sentencing purposes is a question of fact reviewed for clear error. *See Nance*, 236 F.3d at 826; *United States v. Berthimaume*, 233 F.3d 1000, 1002 (7th Cir. 2000). Further, one of the application notes to § 2D1.1 states that an enhancement for a firearm "*should be applied if the weapon was present*, unless it is *clearly improbable* that the weapon was connected with the offense." § 2D1.1, cmt. n.3 (emphasis added) (giving example of a hunting rifle as an unrelated firearm). Once the government proves that a gun was present in the commission of an offense, the burden shifts to the defendant to show that it was clearly improbable that the gun was connected with the offense. *See Berthimaume*, 233 F.3d at 1004.

Here, a judge could reasonably conclude that several of the firearms confiscated by police were connected with the drug conspiracy. Police found several firearms at Lowe's residence, where he kept more than $100,000, which was likely the product of the illegal drug trade. When police executed the search warrant for Lowe's used car lot, which was used as the drop-off location for a van filled with approximately 115 pounds of marijuana, they found a loaded shotgun in the bathroom of the garage. Lowe testified at trial that the shotgun belonged to his mechanic and that he was unaware it was on the premises. However, this assertion does not demonstrate a sufficient improbability that the gun was connected to drug trafficking. In any event, Lowe's testimony does not establish an innocent explanation for the presence of the guns found at his residence, where he kept more than $100,000 in cash, presumably derived, at least in part, from drug

trafficking. The district court's ruling on the § 2D1.1(b)(1) enhancement was not clearly erroneous.

### 4. Lowe's criminal history points.

The final issue in this appeal is whether the district court correctly calculated Lowe's criminal history points. Lowe insists that, under the Sentencing Guidelines, the district court erroneously included two sentences of court supervision, one following a guilty plea and the other following a stipulation of facts. In the sentencing context, we review the district court's legal conclusions de novo and its findings of fact for clear error. *See Parolin*, 239 F.3d at 927-28.

Lowe had two prior Illinois offenses that resulted in sentences of supervision for one year or more. One of the sentences, eighteen months of supervision for unlawful use of a firearm and possession of cannabis, was the product of a guilty plea. The other sentence was one year for disorderly conduct, to which Lowe had made a stipulation of fact. Both orders of supervision provided that upon successful completion of supervision without further offense, the charges would be dismissed. When calculating criminal history points under the Guidelines, the district court must consider prior offenses that have led to a sentence of one year or more upon adjudication of guilt. U.S.S.G. § 4A1.2(a). The district court assigned four points for the firearm/cannabis sentence and one point for the disorderly conduct sentence, placing Lowe in a Category III criminal history. Lowe contends that because he pleaded guilty or stipulated to the facts, and because the sentences were for "supervision," they did not result from an adjudication of guilt, nor should they qualify as "prior history."

Under the Sentencing Guidelines, a "prior sentence" is included in a criminal history only if it was "imposed upon adjudication of guilt." U.S.S.G. § 4A1.2(a). The definition of a "prior sentence" includes sentences of probation and sentences that were totally suspended or stayed, all of which must be counted as part of a defendant's prior criminal history. U.S.S.G. § 4A1.2(a)(3); *see also United States v. Burke*, 148 F.3d 832, 839 (7th Cir. 1998) (treating supervision under Illinois law as the equivalent of probation and counting one year of supervision as part of criminal history even though the charges were eventually dismissed); *United States v. Binford*, 108 F.3d 723, 727 (7th Cir. 1997) (ruling that Illinois sentence of one-year court supervision is properly a prior sentence for Guideline purposes). It is immaterial that the sentence results from a guilty plea or from a stipulation of facts because both count for criminal history purposes. *See United States v. Smith*, 223 F.3d 554, 578-79 (7th Cir. 2000) (holding that the practical effects of stipulation are similar enough to those resulting from a plea of *nolo contendere* to qualify as prior history for sentencing purposes).

Here, there was no error. The points assigned to the firearm/cannabis sentence were appropriate because a guilty plea is an adjudication of guilt under Illinois law. Moreover, the supervisory sentence was equivalent to more than one year of probation, and the eventual dismissal of the charge is immaterial for sentencing purposes. The four points attributable to the firearm/cannabis sentence are sufficient to place Lowe in Category III; hence, any error in attributing one pont to the disorderly conduct sentence is harmless. Even so, the disorderly conduct offense also appears to satisfy the requirements of § 4A1.2(a). It was therefore appropriate to include both sentences as part of the criminal history calculation.

## III.

In summary, all the issues pertaining to the trial of Danny Smith and Harry Lowe are unavailing. The district court did not abuse its discretion when it (1) denied Lowe's Rule 14 motion to sever, (2) denied his motion for a new trial based on alleged defects in the chain of evidence and (3) denied his motion for a new trial based on Petrow's mention of a prior arrest in Kentucky. Under a more stringent de novo standard of review, the district court also did not err when it (4) prohibited Lowe's attorney from cross-examining Swick with agent White's affidavit, (5) narrowed the scope of Smith's cross examination of Lowe's defense witnesses and (6) gave jury instructions that permitted jurors to agree on a range of drug amounts that corresponded to the various drug amount ranges in § 841(b)(1) rather than a precise drug amount.

All the sentencing issues raised by the defendants also fail. The district court did not commit clear error when it (1) found that Smith conspired to distribute 100 kilograms of marijuana and (2) imposed a 2-level enhancement to Lowe's base offense level for possession of a firearm related to the charge of conviction. The district court also did not err when it (3) applied the preponderance of evidence standard to determine the amount of marijuana Lowe conspired to distribute and (4) calculated Lowe's criminal history points.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

**A true Copy:**

       **Teste:**

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*